No. 22,984.

C. E. KING, *Appellee,* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

### SYLLABUS BY THE COURT.

1. MASTER AND SERVANT—*Servant Loaned to Independent Contractor—Liability of Original Master for. Negligence of Independent Contractor*—Where a master loans his servant to an independent contractor but the servant is not informed of that arrangement and works for the independent contractor in obedience to his master's orders and upon the understanding that he is still in his master's service, and in such employment an act of negligence on the part of the contractor causes an injury to the servant, the negligence is attributable to the servant's own master and he is liable in damages to his servant therefor.

2. SAME. A railway company loaned its steam crane and crane crew to a firm of independent contractors which was erecting certain car sheds and material buildings for the railway company. The members of the crane crew knew nothing of the business arrangements between the railway company and the contractors. The regular superior officers of the crane crew ordered them to take the crane and report to the contractors who would tell them what to do. The members of the crew obeyed, on the understanding that they were still in the service of the railway company. One of the crew was injured through the negligence of the contractors. *Held,* that the negligence of the contractors was attributable to the railway company so far as the injured workman was concerned, and the railway company was liable to him in damages.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed February 12, 1921. Affirmed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,* all of Topeka, and *J. E. Torrance,* of Winfield, for the appellant.

*C. L. Swartz,* of Arkansas City, and *Edward J. Fleming,* of Tulsa, Okla., for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff, an employee of the defendant railway company, was injured while at work at a place where some new and additional car sheds were being constructed for the railway company by a firm of independent contractors.

Plaintiff brought this action against the railway company, alleging the circumstances, the negligence, the extent of his injuries, his loss of time, doctor's bills, etc., and prayed for damages.

Defendant answered that at the time plaintiff was injured he was in the service of a firm of independent contractors and under their direction; that defendant had no control over plaintiff while so engaged, nor over the instrumentalities being used, nor over the premises where he was working, nor—

"Over the act or acts, alleged as negligence in plaintiff's petition, all of which, if done or committed were by said independent contractors and without the power of this defendant to manage, control or prevent."

The answer also alleged that the injury was due to an accident and that plaintiff assumed the risk.

On this joinder of issues the cause was tried before a jury.

The evidence showed that the plaintiff had been employed by the defendant for several years. For a year or so prior to his injury he worked in defendant's material yard at Arkansas City. His task was the loading and unloading of heavy bridge timbers, with the aid of a steam crane. In 1916 an independent firm of contractors, Swanson Brothers, was engaged by the defendant to construct some new car sheds and buildings for housing railway property. It appears that Swanson Brothers made some arrangement with the railway company for the use of its steam crane and the crane crew of four or five men, including the plaintiff, to assist in hoisting and setting up some large timbers in these new buildings. Early one morning, December 16, 1916, defendant's foreman, Mr. Moyer, sent a boy to notify plaintiff to be on hand at 6 a. m. He reported for work, and the foreman and Mr. Osborne, the rail-

way superintendent, directed plaintiff and the others of the crane crew to take the crane and go to the place where the new buildings were being erected, and that Swanson would show them what to do.

The plaintiff testified:

"Up to that time I had never been down about where Swansons were, didn't know anything of them, or what they were doing down there in the south yards. I just heard talk that they were building there; I didn't know anything about it. There was no contract made that I knew anything about, concerning what kind of relations, contract, or conditions existed between the Swansons and the Atchison, Topeka & Santa Fe Railway Company. There was nothing said that morning by Mr. Osborne about it, or by Mr. Moyer or any one. I did not know anything about what their relations were."

When the crane crew arrived, two men appeared.

"The engineer said, 'I guess them is the men'; I didn't know them; they come up and said 'Good morning, boys.' I said 'Good morning, gentlemen.' They told us to pull on down, we pulled on down a ways; they had a little tool house built along there, they told us to throw some ropes on that were there, we threw the ropes on, and started on down to where they wanted to raise the frames. They never told me anything about raising the frames until we got right there. Mr. Swanson said, 'I suppose you were sent here to work.' I said, 'Yes, Mr. Osborne said you would tell us what to do.' He says, 'Get those ropes out and tie on this frame, and when this frame is hoisted up you boys steady those ropes, and don't you let them get away.' "

Shortly after the crane gang commenced work, and while a large beam or "bent" was being hoisted, one of a number of iron washers which had been left lying on one end of the beam fell on the plaintiff's head and fractured his skull. The washer weighed four or five pounds. The plaintiff's injuries were severe and permanent.

The defendant requested instructions that as the plaintiff's injuries were sustained while he was working for independent contractors, Swanson Brothers, and as the railway company did not have or exercise any control over the work, there was no liability on the railway company. These were refused. On the contrary the court gave the following:

"4. The undisputed evidence in this case is to the effect that the raising bents in question and the construction of the building for which bents were to be used was by a separate, independent contract between Swanson Brothers and the defendant railroad company. But you are instructed that under the undisputed evidence in this case, even though the erection

of the building was by independent contract, the negligence, if any, upon the part of Swanson Brothers which caused any injury to the plaintiff, would under the evidence here be the negligence of the defendant railroad company.

.     .     .     .     .     .     .     .     .     .     .     .     .

"6. Before the plaintiff can recover in this action he must prove by the evidence and by a preponderance thereof, the burden of proof being upon him, that he was injured, the extent of his injury; that it was by reason of the negligence upon the part of the defendant railroad company. That is, that the Swanson Brothers were guilty of such acts of negligence as contributed directly to the plaintiff's injury. And, as before stated, in that event, the railroad company would be liable."

A verdict for plaintiff was returned, and special findings were made:

"1. What act or acts, omission or omissions of the defendant do you find caused the injury complained of by the plaintiff? Ans. Leaving loose washers on the bent.

"2. Did Swanson Brothers have a contract, with control of the means and instrumentalities, for the construction and erection of the building involved at the time of the accident, with the right to exercise their own will as to the erection of that part of the structure from which the iron washer fell upon plaintiff's head? Ans. Yes.

"3. If you find that plaintiff's injuries were caused by the falling of a loose washer negligently left upon the truss being hoisted at the time of the accident, state whether or not such loose washer was negligently left upon the timbers and negligently hoisted therewith by Swanson Bros., their agents, servants or employees? Ans. Yes.

"4. If you find for the plaintiff, state specifically wherein the defendant, its agents, servants or employees were negligent? Ans. By leaving washer loose on bent and not properly being inspected.

"5. When the plaintiff undertook to assist in the hoisting of the truss upon which the loose washer was placed did he know, or have as good opportunity to know of the danger of such washer falling as the defendant, its agents or employees had? Ans. No.

.     .     .     .     .     .     .     .     .     .     .     .     .

"7. If you find for the plaintiff, state what the defendant should have done to have avoided the accident? Ans. They should have made full inspection before raising bent.

.     .     .     .     .     .     .     .     .     .     .     .     .

"9. Was the iron washer which caused plaintiff's injury negligently left on the truss from which it fell by Swanson Brothers, their agents or employees? Ans. Yes."

Judgment was rendered accordingly and defendant appeals. An elaborate brief, virtually a treatise, is presented for defendant showing—if this court had any doubt on the subject—

that a master is not liable for an injury to his servant when the servant is loaned to another master, and that the injured servant must look to his special employer for the time being for his damages. (Note, 37 L. R. A. 33 et seq.; 1 Labatt's Master and Servant 2d ed., § 52 et seq.)

But here we have to consider a case where the plaintiff did not know that his services were being loaned to an independent contractor. He was in the defendant's service. The defendant's superintendent, his superior, told him to go with the crane and the other men of the crane crew to the new railway sheds under construction and that a man named Swanson would tell him what to do. Like a dutiful servant he obeyed. He obeyed his master, the only master he knew anything about. What were the relations of Swanson or Swanson Brothers to his master meant nothing to him. Whoever plaintiff's superintendent directed him to report to and obey—Swanson or another—was his properly constituted boss or overseer, and plaintiff's obedience and service was to the defendant so far as plaintiff was concerned. No intimation was given to plaintiff that he was about to change his employer, nor was anything disclosed which would have put him on inquiry. The railway company and Swanson Brothers were all one employer under the circumstances. A workman certainly does not change his employer without being aware of it. Termination of employment, like its inception, is a matter of agreement, understanding or notice, express or implied. Before plaintiff could be said to have terminated his employment with the railway company and to have entered the service of Swanson, or to have accepted Swanson as his employer *pro hac vice*, it would have to be shown that he knew of such transfer of his service and consented to it either expressly or by fair implication. And so the trial court's instructions under the undisputed facts were correct.

In *Solomon Rld. Co. v. Jones*, 30 Kan. 601, 2 Pac. 657, where the president of a railway company undertook the work of constructing a line of railway as an independent contractor, but no notice of this was given to the public and the employees of the company did not know of that arrangement, but understood that they were working for the company, it was held that the employees had a right to regard the railway company as their employer and hold it responsible for negligence.

In *Beauregard v. Benjamin F. Smith Co.*, 213 Mass. 259, 45 L. R. A., n. s., 200, it was held:

"In an action under the employers' liability act against a corporation for causing the death of one of its workmen, it is no defense that, after the employment of such workman and before the accident which caused his death, the defendant had transferred to another corporation the business in which such workman was employed, if the deceased workman had no knowledge of a change in his employer and was not put upon inquiry in regard to such a change." (Syl. ¶ 1.)

In the opinion the court said:

"In cases like the present the contract continues until terminated by one party with the knowledge of the other or at least under circumstances putting him on inquiry. Not until it has been so terminated is either party released from the burden. This rule is applicable not only to the payment of wages, but to the fulfillment of the other contractual obligations. The delinquent party is held not on the actual condition of things, but on their condition as the other party has the right under the contract to assume them to be. The rule is founded upon principles of justice and fair dealing." (p. 264.)

In *M. K. & T. Ry. Co. v. Ferch,* 18 Tex. Civ. App. 46, a railway company sent its piledriver and crew to assist an independent contractor who was doing some bridge construction work, but the crew were not informed of the arrangement between the railway company and the independent contractor. One of the crew was injured. The court held that the railway company was his responsible master. It was said:

"We are of the opinion that the allegation that appellee was the servant of appellant was broad enough to cover this phase of the case, since the relation of master and servant is a mutual one and the creature of contract, and can not be severed by the master alone, without notice to the servant. When injured appellee was engaged in the kind of work he had been accustomed to do for appellant, and had been sent there to do the work by appellant, and if appellant designed to sever for the time being the relation of master and servant previously existing, it should have notified appellee, or at least it should appear that appellee had knowledge of the changed relation, so that consent thereto might be imputed to him. The issue was not one of estoppel to be pleaded, but whether the contract of employment still remained in force or had been changed by mutual consent, express or implied." (p. 49.)

The necessity of the workman's consent or acquiescence to a change of masters negotiated between his own master and another master is recognized in *The Standard Oil Co. v. Anderson,* 212 U. S. 215. By these authorities, and by sound reason-

ing also, the complementary rule of law to the one contended for by defendant is that where a master loans his employee to an independent contractor, but the employee is not informed of that arrangement, and works for the independent contractor in obedience to his master's orders, and upon the understanding that he is still in his master's service, an act of negligence of the independent contractor causing such injury to the workman while so employed is attributable to his own master and his own master is liable in damages therefor. If the enforcement of this rule works any hardship, that is a matter for adjustment between the two masters.

The foregoing disposes of the only serious question in this case. The negligence in leaving the heavy washers lying on the end of the beam which was being hoisted high in the air was obviously clear. It was the employer's duty to see that there were no loose materials lying on the beam before it was raised. (*Griffith v. Railroad Co.*, 100 Kan. 500, 504, 505, 164 Pac. 1094; *Midland Valley R. R. v. Griffith*, 245 U. S. 633, 653.) The plaintiff who was working at the other end of the truss which was about 19 feet long was without fault, nor did he assume any such unusual risk as the one which injured him. The amount of the judgment, while large, is not complained of.

The record contains no error and the judgment is affirmed.