**MARION STEAM SHOVEL CO. v. BERTINO et al. ***

**No. 10331.**

Circuit Court of Appeals, Eighth Circuit.

March 12, 1936.

WOODROUGH, Circuit Judge, dissenting.

———◆———

See, also, 10 F.Supp. 354.

Elliott H. Jones, of Kansas City, Mo. (J. M. Strelitz, of Marion, Ohio, and William C. Scarritt, Edward S. North, and Arthur D. Scarritt, all of Kansas City, Mo., on the brief), for appellant.

Clay C. Rogers, of Kansas City, Mo. (O. C. Mosman, C. Jasper Bell, and Paul A. Buzard, all of Kansas City, Mo., Louis N. Wolf, of Joplin, Mo., Cornelius Murphy, Jr., of Kansas City, Mo., and Sylvan

Bruner, of Pittsburg, Kan., on the brief), for appellees.

Before GARDNER, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

## GARDNER, Circuit Judge.

This is an action brought by appellees, as plaintiffs, to recover damages for personal injuries suffered by William Bertino. The parties will be referred to as they appeared below.

On the first trial of the action, the lower court, at the close of plaintiffs' testimony, directed a dismissal on the merits, and from the judgment entered plaintiffs appealed. We reversed the judgment and remanded the cause for a new trial. Bertino v. Marion Steam Shovel Co. (C.C.A. 8) 64 F.(2d) 409, 413. On retrial, plaintiff Bertino recovered judgment for $14,-000, from which defendant has appealed, and seeks to reverse the judgment on the following grounds: (1) The law declared on the former appeal is not binding on this court; (2) Titus was not defendant's servant; (3) if Titus was defendant's servant, so was plaintiff Bertino; (4) there was no proof that Cleon Williams, whose negligence was charged and submitted to the jury, was the servant of defendant; (5) the plaintiffs Mastin & Co. had no right to maintain this action; (6) the court erred in refusing instructions requested by defendant and in giving certain instructions on its own motion.

Plaintiff Bertino was in the general employ of the Alston Coal Company, which was engaged in operating a strip pit coal mine. It entered into a written contract with the defendant, Marion Steam Shovel Company, to purchase a large electric shovel. Pursuant to this contract, the shovel was being erected under the direction and supervision of Ed Titus, who was a regular employee of defendant. In addition to Titus, two electricians, employees of defendant, were employed on the work at the time of the accident. We shall again refer to the terms of the contract, but it is sufficient now to observe that the labor, except the supervision of the erection of the shovel and installation of the electrical equipment and the actual operation of the equipment, was being performed by the Alston Coal Company, through its regular employees, of whom plaintiff Bertino was one, under the supervision of Titus. The appeal does not challenge the sufficiency of the evidence as to the negligence of Titus nor that plaintiff Bertino's injuries proximately resulted therefrom. The recital of the facts of the accident need not therefore go into detail.

Titus, at the time of the accident, was attempting, with the aid of men under his supervision, to connect the dipper of the shovel to a mechanical device known as the dipper stick, in which process a chain was attached to the hoist. This chain belonged to defendant, was seven-eighths inches thick, and of one strand. The movement necessitated that this chain carry the weight of the dipper, and it was necessary to turn the dipper after it had been raised, and for that purpose Titus directed Bertino and the other men working under him to take hold of the dipper so as to swing it around after it had been raised. Titus then unlatched the door of the dipper, permitting the end of the door to fall to the ground. This prevented the men from swinging the dipper, and Titus ordered the engineer to hoist the dipper farther from the ground, and directed the men to take hold of it so as to line it up with the stick when it was raised high enough to be clear of the ground. Bertino, in response to Titus' orders, took hold of the dipper and was pushing on it when Titus gave the electrician another signal to raise it, and the electrician "jerked" the load, causing Bertino's hand to slip in between the dipper and the door, at which time the chain broke causing the dipper to drop, and Bertino's hand was caught between the dipper and the dipper door. When Bertino observed that the chain was to be used to hoist the heavy dipper, he protested to Titus that it was not of sufficient strength. Bertino also suggested removing the door from the dipper, which weighed about two tons, thus relieving the weight and tension on the chain, but Titus insisted that it was safe. It is the contention of plaintiffs that the use of this chain instead of a cable for the purpose of raising the dipper was negligence, and that it was negligence to attempt to raise the dipper with the door open, that the door should not have been attached until after the dipper was fastened to the dipper stick, and that defendant was negligent in suddenly jerking the dipper while Bertino was pushing on it, and also that defendant was negligent in failing to warn Bertino of the danger of the chain breaking.

On the former appeal we stated in an opinion by Judge Booth that the crucial question to be decided was whether, in view of the provisions of the contract between the coal company and defendant, it could be said, so far as plaintiff Bertino is concerned, that it conclusively appears that Titus was at the time of the accident an employee of the coal company. In deciding this question, two tests were propounded: "(1) Whose work was being done by Titus; (2) under whose control was Titus at the time." In construing the contract as between the coal company and the shovel company we said:

"From the provisions of the contract between the two companies, it clearly may be argued that the shovel company was carrying out one of its own obligations in furnishing Titus to superintend the erection and starting of the shovel; and that by performing this obligation upon request, the shovel company was making definite and certain the terms of its guarantee of the machine; in other words, that the work being done was that of the shovel company."

We held that it was a question of fact as to whether Titus was an employee of the shovel company at the time Bertino was injured, even though as between the parties to the contract Titus must be regarded as an employee of the coal company. This holding has become the law of the case. Northern Pac. Ry. Co. v. Van Dusen Harrington Co. (C.C.A.8) 60 F.(2d) 394; Standard Accident Ins. Co. v. Rossi (C.C.A.8) 52 F.(2d) 547; Thompson v. Maxwell Land-Grant & Ry. Co., 168 U.S. 451, 18 S.Ct. 121, 42 L.Ed. 539. But it is strenuously urged that, as this rule is one of mere practice, we should again review the record and recede from our decision on the former appeal. While we are not bound to adhere to our previous decision as being the law of the case [American Surety Co. v. Bankers' Savings & Loan Ass'n (C.C.A.8) 67 F.(2d) 803, 807], yet, ordinarily, all questions determined on appeal should not be reopened upon a second appeal in the same cause. As said by Judge Van Valkenburgh in American Surety Co. v. Bankers' Savings & Loan Ass'n, supra: "The rule 'law of the case,' where applicable, is a salutary one as contributing to repose in litigation, by foreclosing reargument of issues once duly presented and finally decided. It should be departed from only after careful consideration, and upon situations arising in specific cases."

We think the evidence as to the status of Titus is not substantially different from that presented on the former appeal. If there is any material difference in the evidence in that regard, it tends rather to strengthen the contention of plaintiffs on this issue than that of defendant.

The contract for the sale of the shovel was apparently prepared on a regular printed form of defendant. It contains provision that the seller should at any time within 30 days after arrival of the machine and equipment, upon buyer's written request, "transfer within a reasonable time to buyer for a period of * * * consecutive days, the services of one skilled man to supervise, as employe of the buyer, the erecting and starting of said machine; failure to request the services of said skilled man shall constitute an acceptance by buyer of said machine and equipment, and a waiver of any warranty, express or implied, with reference thereto. * * * In addition to the erector furnished by the seller to supervise the erecting and starting of shovel seller agrees to furnish an electrician to supervise the installation of the electrical equipment, without charge to buyer." The contract also contains provision that "the above specified property shall be and remain the property and subject to the order of seller until paid for in full." The equipment had not been paid for at the time of the accident. The contract further provides that: "Seller agrees to furnish without charge to the buyer the usual set of erection tools, etc."

Titus was a regular employee of defendant, sent out by it to supervise the erection öf the equipment in accordance with the terms of the contract. Two electricians, also employees of defendant, were likewise employed on the work at the time of the accident. The erection of the shovel occupied about three months. Titus and the electricians were all paid by defendant, and not by the coal company, and were subject to discharge by defendant, and not by the coal company. Plaintiff Bertino was a regular employee of the coal company, paid by that company, and subject to discharge by that company.

During the process of erecting the shovel, the superintendent of the coal company, believing that Titus was not properly doing his work, complained to his superiors,

whereupon the president of the coal company wrote a letter to defendant, in which he said: "*Your* erector is getting along so slowly with the erection of this shovel, I think you are shipping the upper frame entirely too fast. We are not altogether pleased with *your Mr. Titus,* who is now erecting this shovel. I am enclosing a letter from my general superintendent showing the delays on the erection of this shovel, and this is to notify you that should we have any trouble with the two caterpillars we will certainly expect the Marion Steam Shovel Co. to take care of any expense and at the same time pay us damage for the delay, which may be caused from rearranging these two caterpillars. I have already complained to your Mr. Higgins relative to the erection of this shovel. I have also written your Mr. Gracely complaining of the erection of this shovel. The Marion Steam Shovel Co. have erected four shovels for me previous to this one and we have had no trouble with any of their erectors. * * * In regard to placing the two caterpillars wrong I could have overlooked it if *your* man had placed one of them wrong, but when he went ahead and placed both of them it looked like he had never erected a machine of this type. * * * In regard to the small lateral beams, which Mr. Carder speaks about, he told *your* Mr. Titus this lateral beam would have to be placed before the outside member was put into place; nevertheless, *your* Mr. Titus went ahead and placed the outside member and then had to tear it down and start over again. * * *" (Italics supplied.)

Defendant's letter in reply to the foregoing contained the following:

"We are today writing Mr. Titus inquiring relative to the misplacement of caterpillars, also his inefficient handling of the job. Just as soon as we receive an answer from Mr. Titus we will be very glad to communicate further with you. * * *

"We are very sorry indeed that any misunderstanding or friction should arise between your men and *our Mr. Titus,* but feel assured that when this machine is completely erected, you will find that Mr. Titus had given you a first class job." (Italics supplied.)

The letter from the president of the coal company was not directed to the furnishing of an unskilled workman, but complaint was made of the manner of performing the work and to the possibility of delay for which defendant would be responsible because of the negligence of its employee. There was also expressed the fear that the equipment might give trouble, causing expense for which defendant would be liable. Defendant's reply was certainly susceptible of the construction as an admission that it would be liable for the acts of Titus. These letters tend to show that control of Titus rested in defendant, and that both defendant and the coal company so understood.

■■ It appears from the record that Titus refused to take any orders from the superintendent of the coal company on the job, indicating that he had not assented to a change of employer. It is true that the general servant of one person may become the servant of another by submitting himself to the direction and control of the other with respect to a particular piece of work, but such a relation between the borrower and the servant does not result unless the servant has consented to the transfer of his services to the new master. Kasper v. Kansas City, etc., Ry. Co., 111 Kan. 267, 207 P. 203; Bowie v. Coffin Valve Co., 200 Mass. 571, 86 N.E. 914; Delaware, L. & W. R. Co. v. Hardy, 59 N.J.Law, 35, 34 A. 986; Asch v. Washburn Lignite Coal Co., 48 N.D. 734, 186 N.W. 757; Reeder v. St. Joseph Lead Co. (Mo.App.) 260 S.W. 550; Barney v. Anderson, 116 Wash. 352, 199 P. 452. Where a master loans the labor of his servant to a borrower, retaining supervision and control, the loaned servant does not become the servant of the borrower, but remains the servant of his general employer. The Slingsby (C.C.A.2) 120 F. 748; McCann v. Central Const. Co., 218 Mass. 595, 106 N.E. 598; Employers' Indemnity Co. v. Kelly Coal Co., 156 Ky. 74, 160 S.W. 914, 49 L.R.A. (N.S.) 850; Gulf Refining Co. v. Jackson (Tex.Civ.App.) 250 S.W. 1080, 1082; Tuttle v. Farmer's Handy Wagon Co., 124 Minn. 204, 144 N.W. 938, 939.

In Gulf Refining Co. v. Jackson, supra, it is said: "One may perform a duty in the performance of his services to his master which is for the use and benefit of a third person, without becoming the servant of such third person; and we think the evidence sustains the conclusion that such was the condition in the instant case."

In Tuttle v. Farmer's Handy Wagon Co., supra, plaintiff brought action for

damages against the seller and buyer of a silo, for injuries sustained by him. The seller appealed, alleging error in that the trial court held as a matter of law that one McNown was a servant of the seller. In the course of the opinion it is said:

"That an employer may loan his servant to another, and that the servant so loaned, while engaged in the business for which he is loaned, is a fellow servant of the other employees engaged in such business is amply sustained by the authorities cited by appellant. * * * But we think that McNown had not been loaned to Clow but remained the servant of the company. While the company [the seller] had not agreed to erect the silo, it had agreed as a part of the contract of sale to furnish a man to superintend its erection. By the terms of the contract Clow had relieved himself from the responsibility of superintending the work of erection, and had imposed that responsibility upon the company. Under the contract, the man to superintend the work was to be selected and paid by the company. Clow had no voice in his selection and was not given any control over him. The company sent Mc-Nown to perform the duties which by its contract it had agreed to furnish a man to perform. He was not directed to report to Clow for orders, nor to perform such duties as might be assigned him by Clow, but was sent to take charge of and direct the work for the purpose of fulfilling the obligation assumed by the company. So far as appears he acted wholly under and pursuant to the instructions of the company. He did not place himself under the orders of Clow and Clow made no attempt to exercise control over him. Instead of reporting to Clow for orders, he required Clow's representative to furnish such workmen and such material as he directed. In compliance with his demand, Clow employed plaintiff and several other workmen to perform that portion of the work which under the contract devolved upon Clow. Assuming to act as the representative of the company, McNown took entire control of the work and of the workmen furnished by Clow at his request.

"It seems clear that he was not only an employee of the company, but also engaged in the business of the company, while performing the duties assigned him by the company in respect to the erection of this silo. If a servant be loaned by one employer to another, the servant, for the time being, and for the purpose designated, must cease to be a servant of the one and become the servant of the other."

See, also, Wright Steam Engine Works v. Lawrence Cement Co., 167 N.Y. 440, 60 N.E. 739; Casey v. Davis & Furber Mach. Co., 209 N.Y. 24, 102 N.E. 523; Bartolomeo v. Charles Bennett Contracting Co., 245 N.Y. 66, 156 N.E. 98; Densby v. Bartlett, 318 Ill. 616, 149 N.E. 591, 42 A.L.R. 1406; Flori v. Dolph (Mo.Sup.) 192 S.W. 949; Kelly v. Tyra, 103 Minn. 176, 114 N.W. 750, 115 N.W. 636, 17 L.R.A.(N.S.) 334; Valdick v. LeClair, 106 Cal.App. 489, 289 P. 673, 677; Moss v. Chronicle Pub. Co., 201 Cal. 610, 258 P. 88, 55 A.L.R. 1258; Peters v. United Studios, 98 Cal. App. 373, 277 P. 156.

Appellant strongly relies upon Denton v. Yazoo & M. V. R. Co., 284 U.S. 305, 52 S.Ct. 141, 142, 76 L.Ed. 310, Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 136, 77 L.Ed. 311, and Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 253, 53 L.Ed. 480, asserting that these decisions are authoritative and controlling. The facts in these cases differ radically from the facts in the case at bar. In Denton v. Yazoo & M. V. R. Co., the plaintiff was a United States railway postal clerk who brought suit against two railroad companies for injuries due to the alleged negligence of one Hunter, who was a porter in the general service of the two railroad companies. At the time of the injury, Hunter was engaged in loading mail into a mail car under the direction of the United States postal transfer clerk, and was not as to that work under the direction or control of either of the railroad companies. In the course of the opinion it is said: "Whether the railroad companies may be held liable for Hunter's act depends not upon the fact that he was their servant generally, but upon whether the work which he was doing at the time was their work or that of another; a question determined, usually at least, by ascertaining under whose authority and command the work was being done. When one person puts his servant at the disposal *and under the control of another* for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former." (Italics supplied.)

That is exactly the rule applied in the trial of the instant case. If Titus was un-

der the control of the coal company, then the defendant was not liable, but the jury found that Titus was the servant of, and under the control of, defendant.

Sun Oil Co. v. Dalzell Towing Co. involves a suit in admiralty to recover damages caused to petitioner's tank steamer Sabine Sun. Respondent operated steam tug boats, and by arrangement undertook to assist the Sabine Sun through waters leading to Newark Bay. The agreement between the parties, and it will be observed that this suit was brought by one of the parties to the contract, included provision that, "when the captain of any tug engaged in the services of towing a vessel which is making use of her own propelling power goes on board said vessel, it is understood and agreed that said tugboat captain becomes the servant of the owners in respect to the giving of orders to any of the tugs engaged in the towage service and in respect to the handling of such vessel, and neither the tugs nor their owners or agents shall be liable for any damage resulting therefrom." The Sabine Sun proceeded on her way, using her own propelling power, assisted by the tugs of respondent, and she was grounded outside the channel, due, it was alleged, to the negligence of the pilot furnished by respondent. In the course of the opinion it is said:

"It was not shown that respondent was to have or at any time did have control of the tanker [the Sabine Sun] or that it agreed or undertook to do more than to furnish tugs to assist her while using her own propelling power. Her master, officers, and crew were at their stations, and her propelling power and steering apparatus were used to bring her to destination. And if the pilotage clause is valid, the tug captains while on board the tanker and respectively acting as her pilot were for that turn the servants of petitioner and the respondent may not be held responsible for any act or omission of theirs during the period of that service.'

"The validity of its applicable provision cannot reasonably be doubted."

There it appeared that the respondent did not have control of the tanker and there was a specific agreement, good as between the parties in the movement of this tanker, that the servants engaged became the servants of the owners of the tanker. There seems to be no analogy between that case and the instant case.

In Standard Oil Co. v. Anderson the court said that the question determinative of the issue was, "Whose servant was the winchman when he was guilty of the negligence which caused the injury?" In the course of the opinion it is said: "It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and *places them under his exclusive control* in the performance of it, those men become pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, *retaining the direction and control of them.* In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants *over whom he retains control* is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other we must inquire *whose is the work being* performed,—a question which is usually answered by ascertaining *who has the power to control and direct* the servants in the performance of their work." (Italics supplied.)

We are in entire accord with the doctrine of this case.

When the relation of master and servant has existed up to a certain time, but it is claimed that such relation has ceased and been transferred to a third person, one of the tests is "whether or not the servant by mutual agreement terminated his employment, ceased to be under the control and orders of the former master, renounced obedience to such master, and knowingly and willingly subjected himself to the orders of another under a new agreement with a new master." Palmer v. Skelly Oil Co., 129 Okl. 32, 263 P. 440, 441. The servant has a right to know for whom he works and of an attempt to enforce a change of masters. Barney v. An-

derson, supra. The power of control and direction is usually the deciding factor in ascertaining for whom the servant was working. Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480. The substitution of a new master must be by agreement with the servant. New v. McMillan, 79 Okl. 70, 191 P. 160; King v. Atchison, T. & S. F. Ry. Co., 108 Kan. 373, 195 P. 622. A test of whether one is the employer of another is whether he has the power of control and direction. Commissioner v. Modjeski (C.C.A.2) 75 F.(2d) 468; Yelloway, Inc., v. Hawkins (C.C.A. 8) 38 F.(2d) 731; Hayes v. Battle Creek Power Co., 61 S.D. 385, 249 N.W. 629; Clayton v. Wells, 324 Mo. 1176, 26 S.W. (2d) 969.

■ As further bearing on the status of Titus, it is to be observed that during the progress of the work he made written reports to defendant, to some of which at least replies were made. In one of these letters Titus reported some trouble with the coal company's superintendent. He wrote:

"He (the Coal Company's superintendent) tried to tell me that he was superintendent there and not me. I told him that if that was the case, all he had to do was to sign up the acceptance and I would return to Marion.

"He seemed to think that things were going too slow and said that Mr. Klaner ordered him to stay on the job and push things along.

"Now I have been getting things straightened out as fast as possible and think that from now on I will be able to make better progress. I will start assembling tomorrow."

Another letter from Titus to defendant contains request for expense money. Defendant paid Titus' railroad fare from Marion, Ohio, to Barton county, Mo., and all his expenses on the job. In a letter to Titus defendant expressed regret at the difficulty with the coal company's superintendent, and advised that he work with him and keep him in the best humor possible. The letter contained the following: "As you know, the first impression that he gets from our erectors are the most lasting ones, and, of course, it is to our advantage to have everything during the erection of the machine to move very smoothly."

Titus reported the injury to Bertino to defendant, and defendant directed him to go into detail in respect to it as it might lead to a lawsuit. Titus was supplied with report blanks to make report to defendant. All of these circumstances could properly be considered by the jury as having been made to defendant by its employee. They are susceptible of such construction.

It is said that the right to discharge is an unerring test of whether one is master of another. Densby v. Bartlett, 318 Ill. 616, 149 N.E. 591, 42 A.L.R. 1406. As held on the former appeal, the contract between defendant and the coal company was not binding on plaintiff Bertino, even though as between the parties to the contract it fixed Titus' status as an employee of the coal company. Notwithstanding this declaration, binding on the parties, his actual status was properly a subject of proof, and the interpretation of the parties placed upon the relationship as shown by their conduct indicates that not only did the coal company have no control over Titus or power to direct him in his work, but it had no right to discharge him nor remove him, but he took his orders from defendant. At least the evidence was such as to warrant the jury in so finding, and hence the court could not, as a matter of law, take that issue from the jury.

■ But it is said that, if Titus remained a servant of defendant, then Bertino was likewise the servant of defendant, and hence he is not entitled to maintain an action at law against his employer because of the provisions of the Missouri Workmen's Compensation Act, section 3301, Revised Statutes Missouri 1929 (Mo.St.Ann. § 3301, p. 8232). This contention seems to be based upon the view that there is some inconsistency in there being two masters and two sets of servants engaged in the one enterprise; but the shovel company furnished supervision and the coal company furnished labor. Bertino furnished no services in a supervisory capacity, and furnished no skill in supervision. He was at the time the employee of the coal company, and was performing services for that company. Confessedly, both the coal company and defendant were interested in the erection of this shovel. Defendant had a contractual duty to perform with reference thereto, as did also the coal company. Where servants of two persons jointly engage in a work of mutual interest to their employers, each employee retains the status of a servant of his own master, and it is immaterial that one servant may take or-

ders as to details of the work from the other. New Orleans-Belize, etc., S. S. Co. v. United States, 239 U.S. 202, 36 S.Ct. 76, 60 L.Ed. 227; Baker Tow Boat Co. v. Langner (C.C.A.5) 37 F.(2d) 714; Moss v. Chronicle Pub. Co., 201 Cal. 610, 258 P. 88, 55 A.L.R. 1258; Cannon v. Fargo, 222 N.Y. 321, 118 N.E. 796, 798; Mandala v. Wells, 212 App.Div. 370, 209 N.Y.S. 35, 39; 1 Labatt, Master & Servant (2d Ed.) § 48.

On the former appeal we held that "the labor, except the supervision of the erection of the shovel and the installation of the electrical equipment and the actual operation of the equipment, was being done by the Alston Coal Company through its employees under the supervision of Titus." Certainly, the jury was warranted in so finding under the present record. The work which Bertino was performing was the work which the coal company was obligated to perform. He was hired by that company, paid by it, and subject to discharge by it. His status was not changed by the mere fact that Titus gave him directions or signals calling for his activity and controlling the details of his work. Standard Oil Co. v. Anderson, supra; Driscoll v. Towle, 181 Mass. 416, 63 N.E. 922, 8 A.L.R. 480; McNamara v. Leipzig, 227 N.Y. 291, 125 N.E. 244. There was evidence warranting the jury in finding, as it did, that Bertino was in the employ of the coal company, and not in the employ of defendant.

In view of our conclusions on the other issues, it is not necessary to consider whether Williams was an employee of defendant.

■ The joinder of T. H. Mastin & Co., attorneys in fact for Consolidated Underwriters, the insurer of the coal company, is charged to be erroneous. There does not seem to be any justification for this joinder, as the presence of T. H. Mastin & Co. is entirely unnecessary to a determination of the issues. The misjoinder, if it was a misjoinder, appeared on the face of the complaint, and under the Missouri practice it was subject to demurrer. Apparently a demurrer was interposed, but the ruling upon it is not urged as error in this court. It is sufficient to say that the error, if any, was harmless. It goes to a mere matter of form. Kalanianaole v. Smithies, 226 U.S. 462, 33 S.Ct. 169, 57 L.Ed. 303; Mann v. Doerr, 222 Mo. 1, 121 S.W. 86.

■ We have considered defendant's contention that the court erred in the matter of refusing requested instructions. Those refused, in so far as they contained a proper statement of the applicable law, were covered by instructions given by the court. The instructions as a whole properly presented to the jury the ultimate issues to be determined, and are free, we think, from prejudicial error.

The judgment appealed from is therefore affirmed.

WOODROUGH, Circuit Judge (dissenting).

The Marion Steam Shovel Company manufactured an eight-yard capacity electric shovel in its Ohio factory and sold it to the Alston Coal Company in Missouri on terms customary in such transactions; that is, the manufacturer reserved title until the machine should be set up and paid for, and, in order to get it set up, sent out his experts and erecting tools from the factory, and the purchaser furnished the labor. The job of setting up the machine occupied a number of men for months, and in the course of it a careless order was given by the manufacturer's expert, his hoist operator jerked the load, his chain broke, and a workman on the job was hurt. The workman has sued the manufacturer, and our question concerns the nature and extent of the liability.

The manufacturer contended that his relationship to the experts sent from his factory was fixed by the contract with the purchaser, which provided they should be deemed the purchaser's servants, but this court held, on the first appeal, that the contract did not conclude that matter as to the injured workman. On the second trial it was found that in fact the experts were serving the manufacturer so that the manufacturer was deemed to be present on the job through his servants. It was found that he was responsible and liable to the injured workman for the servants' negligence.

The manufacturer then presents that his liability is determined and limited by the Missouri Workman's Compensation Act (chapter 28, Rev.St.Mo.1929 [Mo.St.Ann. § 3299 et seq. p. 8229 et seq.]). It is conceded that the act does limit the liability to the injured workman so far as the purchaser of the shovel is concerned, but it is held that the manufacturer is outside the act and is liable for $14,000 on a common-

law verdict. The manufacturer was a "major employer" as defined in the act (Elsas v. Montgomery Elevator Co., 330 Mo. 596, 50 S.W.(2d) 130) and it seems to me that the conclusion which has been arrived at fails to carry out the plainly expressed command of the Missouri law.

The act contemplates that the cost of industrial accidents shall be imposed upon the industry and (save for exceptions with which we are not concerned) that every workman shall have speedy recovery of specified compensation against any person using his services at the time, whenever he is injured by accident arising out of and in the course of his employment. "The employer shall be liable, irrespective of negligence, to furnish compensation under the provisions of this chapter for personal injury or death of the employe by accident arising out of and in the course of his employment and shall be released from all other liability therefor whatsoever." Rev.St.1929, § 3301 (Mo.St.Ann. § 3301, p. 8232). The word "employer" wherever used in the act is given a very broad meaning, and includes "every person * * * using the service of another for pay." Rev. St.1929, § 3304 (Mo.St.Ann. § 3304, p. 8238). (There are exceptions not relevant here.) And the word "employee" is just as broad and includes "every person in the service of any employer, as defined in this chapter, under any contract of hire, express or implied." Rev.St.1929, § 3305 (Mo.St. Ann. § 3305, p. 8238). The words "services for pay" and "service under contract of hire" are here used solely to eliminate gratuitous services which have no place in industry. They do not mean that the paying or hiring must be done by the particular "employer" who is made chargeable with liability to furnish compensation to the injured workman. Pruitt v. Harker, 328 Mo. 1200, 43 S.W.(2d) 769. The limitation which the legislature intended to put upon the scope of the act is found in the language which limits its provisions to injuries which occur in the course of the workman's employment. But there is no intent to limit or narrow the class that must pay. That class includes, as it ought to, every person (with irrelevant exceptions) who is using the services of the workman injured in the course of his employment. So considered, the act is coherent and rationally adapted to effect its object; that is, to impose certain and uniform obligation upon those who use the service of workmen and to accord certain and uniform benefit to those who labor in industry.

In this case the manufacturer was the owner of the parts of the electric shovel which was in the course of being set up, and he could get no pay for the shovel until he could get it set up. The injured workman, although he drew his wages from the coal company, had been directed by that company to do whatever the manufacturer's expert told him to do, and, having consented, was working under the orders of the manufacturer's expert to assemble the machine. So were the other workmen, including the hoist operator, who was paid by the manufacturer.

It has been found that the manufacturer was on the job through his servants, the experts; and, if he was, it is very plain that he was "using the services" of the injured workman within the words of the Compensation Act; that is, the manufacturer, through his expert, was directing the workman's efforts, commanding and receiving his obedience, and the fruit of the labor inured primarily to the manufacturer. By "using the services" of the workman, the manufacturer was getting the machine parts that belonged to him assembled and his machine set up so that he could demand his pay for it. At the particular moment of the accident the manufacturer's hoist operator had the immense weight of the dipper raised by the manufacturer's hoist and hanging up in the air by a chain that belonged to the manufacturer. The manufacturer's expert, bossing the job, told the workman to take hold of the dipper to guide it, and in obedience to the command the workman did so and was hurt. That the manufacturer used the workman's services seems to me like an axiom—beyond argument. He used the man's services, the man got hurt in the course of his employment, and the command of the statute that the one who used the services be held liable in a certain specified way ought to be enforced by the courts.

It has been argued that the manufacturer and the workman did not, in every respect, occupy the relation of master and servant according to some common-law learning. There are lines of reasoning in that field leading to the conclusion that, although the manufacturer had his "erection tools" and his men there on the work, and one of his men was bossing the job,

and another had a great weight lifted up in the air with a hoist, and the machine part had to be guided to its position by the hand of a workman, still the manufacturer was not the master of the workmen. The learning belongs to a past era in Missouri. The scrivener of her Workman's Compensation Act knew about it and departed from common-law nomenclature altogether. The new law made the manufacturer of the shovel an "employer" of the workman when he "used the workman's services" to set the machine up, and the old learning is not required to apply the plain words of the statute to the facts.

The act also provides that, "if the injury * * * occurs while the employee is in the joint service of two or more employers, their liability shall be joint and several, and the employee may hold any or all of such employers." Rev.St.1929 § 3307 (Mo.St.Ann. § 3307, p. 8242). As an "employer," wherever referred to in the act, is (with irrelevant exceptions) "any person who uses the services of another," this provision may be read: "If the injury occurs while the employee is in the joint service of two or more persons who use his services, he may hold any or all of those who use his services." Manifestly, the provision completely covers injuries to a workman when two or more persons are using his services. In a case like the present, where both the manufacturer and the purchaser of the shovel were acting together to set the shovel up so that the manufacturer could get his pay for it and the purchaser could dig with it, any possible resort to the common-law refinements about who is answerable as a master to a servant is completely eliminated, and, unless such resort is eliminated, the main legislative object, to establish a simple and uniform system of workman's compensation, is hopelessly defeated. Either or both the manufacturer and the purchaser were liable to pay for the workman's injury, and the liability of each was limited. The act covers the situation presented by the facts in words as precise and clear as the most skilled philologist could pick out.

The act does accord a common-law action to a workman who has been injured by "a third person." But, where a manufacturer has hoisted the dipper of his electric shovel and holds it suspended at the end of a chain, and calls on an obedient workman to guide it, such manufacturer is not a third person to such a workman. The act means a stranger, an outsider, who, neither by himself nor with others, is using the service of the workman. The provision reserving to the workman his common-law right against such a stranger completes the plan of the act as it has been laboriously evolved out of industrial experience and accords with the rationale of it.

The setting up of big machines brought into Missouri by manufacturers is an industrial operation that involves danger to workmen, and there is no reason to suppose that the Legislature intended to put those who are carrying on such an operation outside of the pale of the Workmen's Compensation Act. Every reasonable intendment should be indulged to avoid such a crippling of the act. As the situation has been worked out here, the manufacturer of the machine is bereft of the defenses he would have if he were deemed a master setting the machine up through the work of his servants, he is deprived of the limitation of liability provided by the act, and is put in the position, to most practical intents, of an insurer of the workmen's safety in an amount to be left to the jury. Such a discrimination between those mining coal in Missouri and the stranger who brings mining machinery within the gates was certainly never in the mind of the Legislature. Its act aims at uniform simplicity. I do not agree that such complex disparities ought to be brought about judicially. The decisions under the various Workmen's Compensation Acts, which have been passed in many states, are pouring out in great numbers, and there appear to be as many opinions as there are men called on to express themselves. None of the Missouri decisions appears to cover the exact situation here presented. The only safe way is to write the opinion with the forefinger held upon the very words of the statute and with firm intent to enforce the act according to the spirit.

It seems to me the judgment should be reversed on the ground that the workman was entitled to statutory compensation, and *no more.*