Ronald W. BUTTERFIELD, Plaintiff
and Appellant,

v.

CITIBANK OF SOUTH DAKOTA, N.A.,
Defendant and Appellee.

No. 16067.

Supreme Court of South Dakota.

Considered on Briefs Sept. 2, 1988.

Decided March 15, 1989.

John E. Burke and Donald N. Srstka, Sioux Falls, for plaintiff and appellant.

Ronald W. Banks of Banks, Johnson, Johnson Colbath & Huffman, P.C., Rapid City, for defendant and appellee.

MORGAN, Justice.

### ACTION

Ronald Butterfield (Butterfield) appeals a summary judgment granted in favor of Citibank of South Dakota (Citibank) in Butterfield's wrongful discharge action against Citibank. We affirm.

### FACTS

Butterfield began employment with Citibank in 1982. There was no fixed term of employment other than general assurances that he would be employed as long as he met Citibank's expectations. Butterfield did receive an employee handbook entitled "Working Together" which set forth Citibank's personnel policies, benefits and work philosophies. Included in this handbook was a section termed "Corrective Action" described as a guide to help supervisors deal with employee performance or

disciplinary problems. It outlined a four step approach: discussions; formal warnings; final warnings; and, suspension. An opportunity for review was to be provided at each step of the procedure. In its memorandum decision, the trial court stated:

> For the purposes of this motion, the parties agreed that the manual prepared by defendant and distributed to its employees, Working Together, [constituted] the contract agreement between the parties as it relates to this employment relationship.

During the course of his employment, Butterfield received a copy of a memorandum concerning employee/media contacts. The memorandum directed that all employee contacts with the media were to be cleared with Citibank's Public Affairs Office. Failing to comply with this memorandum by obtaining the requisite clearance, Butterfield initiated a contact with a local newspaper. Butterfield sought to gain publicity regarding his hobby of researching and investing in the stock market. Butterfield hoped that this publicity would assist in establishing his credentials as a stock market analyst so that he could eventually publish his own investment newsletter.

The news article on Butterfield and his hobby was published in early 1986. The only reference in the article to Citibank identified it as Butterfield's place of employment and gave his job description. The same day that the article was published, Butterfield was called to meet with his supervisor and a senior vice president for Citibank. The two expressed their displeasure over the news article and the fact that Butterfield had not cleared the article with the Public Affairs Office. Butterfield was then presented with a prepared resignation which he signed.

Subsequently, Butterfield filed a wrongful discharge complaint against Citibank raising six causes of action. Butterfield's claims included one for breach of express or implied contract, one for breach of implied covenants of good faith and fair dealing and additional tort claims. Citibank moved for summary judgment on all of Butterfield's claims and the motion was ultimately granted.

## ISSUE

Did the trial court err in granting Citibank's motion for summary judgment?

## DECISION

The parties having agreed, and the trial court having adopted such agreement that the handbook "Working Together" created a contract of employment, the real issue appears to be whether Citibank violated the terms of the contract. Butterfield contends that it did so by failing to follow the "Corrective Action" provisions of the handbook. Citibank's response is that by its terms the handbook delimits the procedure by stating, "[h]owever, in appropriate instances, failure to meet the Bank's standards can result in release without notice or severance pay." Butterfield, in turn, contends that this provision is ambiguous in that the handbook does not specifically define these "appropriate instances." Therefore, Butterfield argues that the question of whether his violation of the directive on media contacts was an "appropriate instance" requiring his immediate release was a material question of fact for a jury to decide.

■ A summary judgment will be affirmed only if there are no genuine issues of material fact and the legal questions have been correctly decided. *Bego v. Gordon*, 407 N.W.2d 801 (S.D.1987). Where a provision of a contract is ambiguous, evidence must be introduced to determine what the intentions of the parties were and such evidence creates a question of fact which must be resolved by a jury. *North River Ins. Co. v. Golden Rule Const.*, 296 N.W.2d 910 (S.D.1980); *Delzer Const. Co. v. South Dakota State Bd.*, 275 N.W.2d 352 (S.D.1979). However, whether ambiguity exists in a contract is a question of law for the court. *North River Ins. Co., supra.* This court is free to review a contract in the first instance and to make its own determination concerning ambiguity without any presumption in favor of the trial court's determination. *Id.*

■ Based upon our review of Citibank's employee handbook, we find the provision permitting Citibank to discharge employees without notice in "appropriate instances" to be unambiguous. Like the trial court, we find that the employee handbook does not contain a "for cause only" agreement by Citibank for discharge of its employees. Absent such an agreement, Citibank employees are terminable at will. *Osterkamp v. Alkota Mfg., Inc.,* 332 N.W.2d 275 (S.D. 1983); *Cutter v. Lincoln Nat. Life Ins. Co.,* 794 F.2d 352 (8th Cir.1986); SDCL 60–4–4. Thus, the language of the handbook permitting Citibank to discharge employees without notice in "appropriate instances" merely reflects the terminable at will status of its employees. No definition of "appropriate instances" is necessary because Citibank reserves the right to discharge its employees *whenever it determines* such action is appropriate.

As this court has recently observed, "[d]espite numerous challenges, the employment-at-will doctrine is still the law in South Dakota." *Larson v. Kreiser's Inc.,* 427 N.W.2d 833, 834 (S.D.1988). The doctrine is codified at SDCL 60–4–4 which provides in pertinent part: "[a]n employment having no specified term may be terminated at the will of either party...." However, in *Osterkamp, supra,* a narrow, contract-based exception to the employment at will doctrine was recognized where an employer specifically agrees in an employee handbook to discharge employees, "for cause only." Where such an agreement is contained in a handbook and an employer fails to abide by its terms in discharging an employee, a cause of action will lie on behalf of the employee against the employer for breach of the agreement. *Id.*

A review of *Osterkamp, supra,* indicates two possible ways that language in an employee handbook can be construed as creating a discharge "for cause only" agreement. *Id; Cutter, supra.* First, such an agreement may be found where the handbook explicitly provides, in the same or comparable language, that discharge can occur "for cause only." *Id.* Second, a "for cause only" agreement may be implied where the handbook contains a detailed list of exclusive grounds for employee discipline or discharge and, a mandatory and specific procedure which the employer agrees to follow prior to any employee's termination. *Id.* In short, the handbook must contain language indicating a clear intention on the employer's part to surrender its statutory power to terminate its employees at will (SDCL 60–4–4). As the Supreme Court of Oregon has stated, "[i]n the absence of any evidence of express or implied agreement whereby the employer contracted away its ... prerogative [to determine whether facts constituting cause for termination exist] to some other arbiter, we shall not infer it." *Simpson v. Western Graphics Corp.,* 293 Or. 96, 643 P.2d 1276, 1279 (1982).

Upon review of Citibank's employee handbook, we find no explicit agreement by Citibank to discharge employees "for cause only." Nor do we find sufficient language from which to imply an agreement to discharge employees "for cause only." In this regard we set forth the following pertinent handbook language:

### Corrective Action

Good working relationships require everyone to meet their responsibilities to the Bank, themselves, and the people with whom they work.

At all times staff members are expected to meet the Bank's standards for work performance and business conduct, *and* to follow the policies and procedures covered in Working Together.

This is where the corrective action process comes into play. Through it, staff members are given a chance to improve when their performance doesn't meet Bank standards. *However, in appropriate instances, failure to meet the Bank's standards can result in release without notice or severance pay.*

\* \* \* \* \* \*

The corrective action procedure is a *guide* to help supervisors deal with performance or disciplinary problems. Working within the framework of this procedure, *the supervisor applies his or*

*her own judgment as to how a problem can best be handled.*

Depending on the situation, and the staff member's degree of improvement, the supervisor may repeat, *bypass, or shorten* the time span between any of the steps listed below. (emphasis added).

It is apparent from the language emphasized above that Citibank has expressed no clear indication, of the sort contemplated in *Osterkamp, supra,* of an intention to surrender its statutory power to terminate employees at will (SDCL 60-4-4). Although the handbook does contain several specific grounds for employee discipline, the provisions above caution that employees are expected to meet standards for performance and conduct *in addition to,* "the policies and procedures covered in Working Together." Further, the above provisions indicate that "Corrective Action" is not a mandatory process but merely a "guide" to help supervisors deal with disciplinary problems. Within this "guide" supervisors are free to exercise their own judgment as to how to handle a specific problem. Particularly pertinent is the fact that in handling a personnel problem a supervisor is free to "bypass" any of the steps in the "Corrective Action" process. Thus, it is clear that "Corrective Action" is not a mandatory procedure which must be followed prior to any employee's termination.

Our conclusion that Citibank's employee handbook does not contain a "for cause only" termination agreement is not altered by the fact that the parties have agreed that the handbook constitutes the "contract" of employment between Butterfield and Citibank. As the Supreme Court of Michigan has stated:

> Employers are most assuredly free to enter into employment contracts terminable at will without assigning cause. We hold only that an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract.

*Toussaint v. Blue Cross and Blue Shield of Mich.,* 408 Mich. 579, 292 N.W.2d 880, 890 (1980). Thus, a "for cause only" termi-

nation agreement will constitute a binding and enforceable contract (*Osterkamp, supra*) but an employment contract need not always contain a "for cause only" termination agreement. (*Toussaint, supra*).

■ Having resolved Butterfield's contentions concerning ambiguity, no genuine issue of material fact remains in this case. Butterfield was an employee terminable at Citibank's will. It was not necessary for Citibank to follow the Corrective Action process prior to Butterfield's termination. Accordingly, summary judgment for Citibank on Butterfield's claim for breach of express or implied contract was appropriate as a matter of law. *Blote v. First Federal Sav. and Loan Ass'n.,* 422 N.W.2d 834 (S.D.1988); *Bauer v. American Freight System, Inc.,* 422 N.W.2d 435 (S.D. 1988).

■ As to Butterfield's claims for wrongful discharge based upon various tort theories, we find that they have no validity as Butterfield was an employee terminable at will. *Blote, supra.* Therefore, summary judgment for Citibank on these claims was also appropriate. *Id.*

Finally, with regard to Butterfield's claim for breach of the implied covenants of good faith and fair dealing in commercial transactions, we observe that this court has specifically rejected this cause of action in the employment at will context. *Breen v. Dakota Gear and Joint Co., Inc.,* 433 N.W.2d 221 (S.D.1988). Therefore, summary judgment for Citibank on this claim was again appropriate as a matter of law. *Id.*

Summary judgment for Citibank is affirmed.

WUEST, C.J., and MILLER, J., concur.

SABERS, J., dissents.

HENDERSON, J., disqualified.

SABERS, Justice (dissenting).

For the purpose of summary judgment, the facts must be taken in the light most favorable to the non-moving party. *Groseth International, Inc. v. Tenneco, Inc.,* 410 N.W.2d 159 (S.D.1987); *Wilson v.*

*Great Northern Railway,* 83 S.D. 207, 157 N.W.2d 19 (1968). In this case, the trial court viewed the evidence most favorable to the moving party, Citibank, instead of the non-moving party, Butterfield. Butterfield had worked for Citibank from January 18, 1982, and was a senior planning consultant in telecommunications until his forced discharge on September 30, 1986.

Butterfield's complaint alleged the following facts and claims:

During the time of Butterfield's employment, he was a loyal, industrious employee who performed his work well. He received regular performance appraisals which were all well above the average standard as set by Citibank. Based upon these appraisals, Butterfield was promoted twice during his employment with Citibank and it was upon these appraisals that he was being considered for a salary increase at the time of his discharge. In addition, he made major contributions to service quality improvement for Citibank's operations.

Citibank provided Butterfield and all its employees an employment manual entitled WORKING TOGETHER. WORKING TOGETHER is thirty pages long, contains seven divisions, and sixty-four subdivisions. WORKING TOGETHER makes numerous statements concerning employment at Citibank, including but not limited to: Citibank's commitment to its employees, its work environment, its respect for human dignity, its standards for work performance and business conduct, its performance evaluations, its policy regarding the avoidance of terminating the jobs of its employees, its policies regarding discipline, problem review, and requested resignation. It also specifically deals with the buying and selling of market securities and outlines a procedure whereby the employees can establish an account with Citibank to buy and sell securities.

On September 10, 1984, Charles E. Long, Citibank's employee, published and approved a memorandum about clearing public contacts and public statements, but specifically limited the clearance prerequisite to statements concerning the operation of Citibank. On March 31, 1986, the Sioux Falls Argus Leader, a daily newspaper published in Sioux Falls, South Dakota, carried a profile article about Butterfield and his personal hobby, pursued in his spare time, of researching and investing in the stock market. A copy of this article is attached to this dissent. On the same day the profile was published in the Argus Leader, Butterfield was called in by a senior vice president of Citibank who said that allowing the Argus Leader to publish the profile about him was a serious error in judgment. Butterfield was informed that he was no longer a value to Citibank, that he obviously would rather be in the stock market than working for Citibank, and that he must sign a letter of resignation. Citibank claimed that the profile article reflected negatively on Citibank in the eyes of the community. *See* attached article.

At the time of this forced resignation, Butterfield was advised he was being fired because of the publication of the profile in the newspaper. There was no mention of any other reason for the termination. Sometime after his forced resignation, he was advised, for the first time, that his management style and career objectives were not in harmony with those of Citibank and that was why his employment was terminated.

Although these allegations were denied by Citibank's answer, they are basically supported by Butterfield's affidavit, deposition, and the files and records herein.

The trial court conceded that WORKING TOGETHER was a contract of employment, stating:

... Plaintiff understood that his employment was for as long as he performed and met the expectations of the employer. For the purposes of this motion, the parties agreed that the manual prepared by Defendant and distributed to its employees, Working Together [was] the contract agreement between the parties as it relates to this employment relationship.

When Butterfield began his job, he was on probation for a three-month period of time. According to WORKING TOGETHER, his job could be terminated by Citibank

for any reason and without notice. The inference is that his job could be terminated only for specified reasons after the probationary period. WORKING TOGETHER provided that after probation and performance evaluations the employee would get changed to the status of a non-probationary, full-time, "staff member," entitled to all the benefits and security promised in WORKING TOGETHER—since all non-probationary employees were designated "staff members." When Butterfield finished his probationary period, his supervisor told him that he had a job with Citibank for as long as he performed within the perimeters of WORKING TOGETHER. Butterfield specifically stated in his affidavit that he relied upon the contents of WORKING TOGETHER and considered it to be his employment contract with Citibank. These material facts cannot now be disputed. WORKING TOGETHER was a unilateral offer of employment terms and conditions from Citibank to its employees. *Woolley v. Hoffmann–La Roche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1985).

A summary of the relevant provisions of WORKING TOGETHER provides:

**Staff Member Responsibilities** (which includes all non-probationary employees) establishes the Citibank guidelines for behavior and appearance, which the handbook says are mostly common sense items which the employee doesn't have to think about twice.

**Employment Classifications** varied from the permanent full-time, eligible for all the benefits and with all the contractual employment rights, to temporary part-time, having no benefits and dischargeable "at will."

**Job Security** admits that job security is as important to Citibank as it is to the employee and that is why Citibank has a policy to avoid, whenever practical, terminating the services of employees....

**Investigations** (of theft and the like) which provided that the employee must submit to polygraph examination and a search of his locker and desk, etc. Failure of the employee to submit could lead to his dismissal, but before dismissal, an employee must be given a final review by senior staff members.

**Corrective Action** is the detailed remedial procedure which applies to all permanent employees after they have completed their probationary period. It is used as a guide to help supervisors deal with performance or disciplinary problems. The employee is given basic due process rights regarding problems he is having at Citibank. Corrective Action says that at all times employees are expected to meet Citibank's standards for work performance and business conduct, and to follow the procedures covered in **Working Together.** Through Corrective Action, however, employees are given a chance to improve, when their performance doesn't meet these standards. The purpose of Corrective Action is to correct the problem, improve performance and retain the employee's services for the bank. The first step is discussions with the employee and his supervisor; step two, is a formal warning; and step three, is the final warning which means that if the employee doesn't improve he may be released. The employee is guaranteed that he has an opportunity for review. Corrective Action also says that in serious cases, a formal or final warning may be the first step in the process, and if the employee's actions are seriously disrupting department or if the problem requires immediate attention, the employee can be suspended without pay during the investigation of the problem. Corrective Action also makes it necessary for the employee to sign a Corrective Action Form saying that he has read it and understands it.

Also contained in Corrective Action is the statement which says, "However, in appropriate instances, failure to meet the Bank's standards can result in release without notice or severance pay."

The majority affirms summary judgment by holding that the provisions of WORKING TOGETHER create merely an at-will employment contract, as a matter of law. To reach this result, the majority reasons that the "corrective action" procedures are merely optional "guidelines." The opinion

asserts that the phrase, "in appropriate instances, failure to meet the Bank's standards can result in release without notice or severance pay" unambiguously limits the "corrective action" procedures and creates an at-will employment relationship.

If the majority's analysis were correct, WORKING TOGETHER should be renamed "WORKING TOGETHER UNTIL FIRED AT WILL OR AT WHIM." The majority claims that these standards and policies are completely subjective and that it does not have to give the employees even a hint as to what they might be. Such arbitrary and capricious action, if accepted, would negate all other provisions contained in WORKING TOGETHER.

The phrase "appropriate instances" is ambiguous. A contract is ambiguous where there is a genuine uncertainty as to which of two or more interpretations is proper. *North River Ins. Co. v. Golden Rule Constr.*, 296 N.W.2d 910 (S.D.1980). "Appropriate instances" has at least two different meanings. The majority interprets "appropriate instances" to mean that "Citibank reserves the right to discharge its employees whenever it determines such action is appropriate." However, the majority concedes that the handbook contains specific grounds for employee discipline.[1] In light of this fact, and the other provisions in the handbook, "appropriate instances" may also be interpreted to mean that Citibank may only discharge an employee without following the "corrective action" procedures where one of the specific enumerated grounds for employee dismissal has been violated. An ambiguous contract creates a question of fact for the jury and evidence must be introduced to determine the intentions of the parties. *Bauer v. American Freight System, Inc.*, 422 N.W.2d 435, 438 (S.D.1988) (Sabers, J., dissenting); *North River, supra.*

In his undisputed affidavit, Butterfield said that he was lead to believe that if he had a problem at Citibank, he would be entitled to the corrective action procedure, and based upon WORKING TOGETHER he had at least three chances to change any problem called to his attention before his job could be terminated. He was not aware of anyone at Citibank being forced to resign without Citibank at least going through the steps as outlined within the corrective action procedure.

Butterfield was never advised of a specified or even implied standard set out in WORKING TOGETHER which he had violated, including work performance, business conduct or bank policy. If Citibank contends that Butterfield breached some specified standard, that would be a fact question precluding summary judgment. *Groseth, supra; Wilson, supra.*

The "Internal Memorandum" to all officers of Citibank discussed media pressure for information about Citibank's operations and pointed out that public statements about Citibank could be harmful to its competitive position or could be inaccurate or imprudent. It was obviously intended only to prevent Citibank employees from making public statements about the operations of Citibank or its personnel without clearance. In the Argus Leader profile, the only reference to Citibank is a statement that Butterfield worked there. The article had absolutely nothing to do with Citibank's operations.

Butterfield also stated in his affidavit that Richard McCrossen, the president of Citibank South Dakota, specifically ordered that he be fired and left it to the next tier in the hierarchy to determine an appropriate reason. The firing was more aggravated by the belated official reason given Butterfield for his job termination, that his "management style and career objectives" were not suited to Citibank. A jury could infer that Citibank began to realize that the "on the spot" reason given for the termination on March 31, was neither legal nor substantial and it decided to come up with something a little more convincing to defend the arbitrary action. If Butterfield's management style and career objectives

---

1. The enumerated reasons for employee dismissal are: 1) theft; 2) selling or passing illegal drugs to Citibank employment; and 3) failure to notify supervisor of absences three times in a row.

were not suited to Citibank, it stands to reason that some place along the line it would have surfaced in his job performance appraisals. Citibank apparently forgot that, by publishing and disseminating WORKING TOGETHER, Citibank relinquished the power to fire employees "at will" and promised them the corrective action procedure before severing the employment connection. Through its corrective action procedure, WORKING TOGETHER affords the employee basic due process rights along with a second chance to improve and is similar to the employee handbook in *Osterkamp v. Alkota Mfg., Inc.,* 332 N.W.2d 275 (S.D.1983).

I submit that the majority opinion's reliance on *Cutter v. Lincoln Nat'l Life Ins. Co.,* 794 F.2d 352 (8th Cir.1986), is misplaced.[2] The *Cutter* case erroneously interpreted South Dakota law as stated in *Osterkamp.* As stated in Circuit Judge Richard Arnold's dissent in *Cutter, supra* at 357:

> I respectfully dissent from the Court's holding that no cause of action for breach of contract was made out in this case. It is apparently undisputed that the procedures specified in defendant's employee handbook were not followed. The handbook promised that an immediate investigation would be held if the company became aware of any apparent dishonesty, misrepresentation, or other failure to fulfill the responsibilities of a life insurance agent. Further, the handbook assured employees that penalties appropriate to the offense, including termination, would be imposed "*[i]f* that investigation confirms any wrongdoing" (emphasis mine). Part of the employment contract, therefore, was a promise by the employer that the employee accused of misconduct falling within any of the defined categories would not be terminated or otherwise punished unless an

investigation confirmed that an employee was in fact guilty of the alleged wrongdoing.

Butterfield had a reasonable belief that he would not be terminated without corrective action being taken, without notice, and a reasonable time to take corrective action unless he was discharged for one of the enumerated reasons. For the majority opinion to claim that the language of the handbook permitting Citibank to discharge employees without notice in "appropriate instances" merely reflects the terminable at will status of its employees constitutes reversal by implication of the letter and spirit of *Osterkamp.*

If this conduct is upheld on summary judgment and without a trial it means that even today the employees of Citibank are employees at sufferance—the sufferance being the unilateral whim of collective upper management. Butterfield argues that Citibank refused to give an example, refused to give a warning—they stand on their pedestal and say, "We don't know what it is, we can't tell you what it is—but whatever it is, when it happens we'll let you know—on your way out." The law of the state of South Dakota requires more. The handbook WORKING TOGETHER requires more. The best interests of Citibank requires more. This case should be reversed and remanded for a jury trial.

I would also reverse and remand for a jury trial because Citibank breached its obligation to Butterfield of good faith and fair dealing. *See* my special writings in *Breen v. Dakota Gear & Joint Co., Inc.,* 433 N.W.2d 221, 224 (S.D.1988); *Johnson v. Kreiser's, Inc.,* 433 N.W.2d 225, 228 (S.D.1988); *French v. Dell Rapids Community Hospital,* 432 N.W.2d 285, 292

---

**2.** *See* Note, *Cutter v. Lincoln Nat'l Life Ins. Co.,* 32 S.D.L.Rev. 104 (1987), in which the author criticizes the Eighth Circuit decision for setting up a standard, not found in *Osterkamp,* supra or *Hopes v. Black Hills Power & Light,* 386 N.W.2d 490 (S.D.1986), by saying that the employment contract must contain specific, detailed, explicit promises of termination for "cause only" in order to support an exception to the termination at will doctrine. The author writes that the Eighth Circuit standard is unprecedented and effectively denies employees the protection of South Dakota law. The question simply is whether Citibank followed its own procedural handbook.

(S.D.1988); *Larson v. Kreiser's, Inc.*, 427 N.W.2d 833, 835 (S.D.1988); *Blote v. First* *Fed. Sav. & Loan*, 422 N.W.2d 834, 838 (S.D.1988).

# Man plays market from Sioux Falls

**By BRENDA WADE**
Argus Leader Staff

When something is out of reach, Ron Butterfield stretches.

In a 10-year period of investing in the stock market as a hobby, Butterfield has found that being on Wall Street is not a necessity in making profitable investments.

"People who have an interest can do it whether they're here or anywhere else," he said. "We can do it in South Dakota just as easily as they can do it on Wall Street.".

Butterfield and a friend started investing in the stock market about 10 years ago with $250 each. In 18 months they earned $550.

"I was hooked on the stock market at that time and started reading everything I could get my hands on," he said.

Butterfield, 38, is a senior planning consultant in telecommunications with Citibank in Sioux Falls. He and his two sons play football in the basement during the winter and canoe or hike in warmer weather.

After getting degrees in science and math from Sioux Falls College in 1971, Butterfield went to the North American Baptist Seminary for a year. His father and brother are a Baptist ministers.

"It's something I had decided after three years I would go back and see if it would be a fit," he said.

Instead, Butterfield decided to work in finance. He remains active in the congregation at First Baptist Church. He wrote his first poem a week a go in a creative writing class at the church.

During the past three years, Butterfield has used his own method of choosing stocks. On the average he invests between $10,000 and $15,000 at a time. He said the minimum he would invest in one stock would be $500 with a maximum of $2,500. He keeps his stocks for at least one year, and returns on his money are about 220 percent.

Despite successes and a hope to pay off an addition to his house with one investment, there are times that plotting and planning have not always worked. "There are the non-success stories too," Butterfield said.

On his wall he keeps a certificate from stock he bought in a company that went bankrupt next to a certificate for a successful stock. "If you invest and it turns out to be wrong,

## Profile

**Name:** Ronald W. Butterfield.
**Date of birth:** Aug. 14, 1949.
**Hometown:** Sioux Falls.
**Occupation:** Senior planning consultant in telecommunications with Citibank.
**Education:** Bridgewater High School, 1967; science and mathematics degrees from Sioux Falls College, 1971; one year of seminary studies at the North American Baptist Seminary.
**Family:** Wife, Kaye; sons, Jeremy, 9, and Alex, 7; daughter, Tina, 2.
**Interests:** Investing, reading, family, church and jogging.

## Personality

it's a lesson you never forget," he said.

Butterfield calls his method of investing "The Butterfield Index." He said the approach reflects his non-risky personality. He wants to start a newsletter and become registered as an investor.

"To actually be able to do that sort of thing for a living seems ideal," he said.

Each month, Butterfield screens 3,000 stocks before deciding those that would be good investments. He looks for companies that are temporarily distressed and have a chance of improving.

Butterfield looks at six factors in determining a good purchase: Ratios of price to book value, price to sales, debt to equity, price to earnings, whether or not the stock pays a dividend and trend in earnings.

"I don't worry so much about the direction the market will be going as many people do because I can't begin to predict if it will go up or down," he said.

Investment management is Butterfield's career goal; he would like to do it in Sioux Falls and not on Wall Street.

"That was what I was told would really not be possible," he said. "I got all the reasons why it couldn't be done." But he likes the tangible results and the independence.

"There are particular things that all of us are good at ... my particular philosophy is to find out what that is as early as you can in life and then go out and make it happen."

Argus Leader photo by JOCELYN WILLIAMS

Ron Butterfield stands in his office, surrounded by books about investment.

For now, he doesn't have clients and makes the picks for fun. Sometimes he will tell friends about information he has on stocks and let them make their own decisions.

"A lot of times it's been hard to stick with. I've almost been doing it in a secret little corner down here," Butterfield said. He has an office in his basement filled with *Wall Street Journals*, books, magazines and a computer.

"Our expectations are so high sometimes. We need to have them be realistic but they still need to be out there to stretch us."

Over time Butterfield hopes that stretching leads him to his investment goals.

Until then, he has his theory on stocks. "It's just a matter of patience. If you can wait long enough, it will turn out O.K,".