Mary Hale **JOHNSTON**, Plaintiff
and Appellant,

v.

**DLORAH, INC., d/b/a National College,**
Defendant and Appellee.

No. 18635.

Supreme Court of South Dakota.

Considered on Briefs Sept. 15, 1994.

Reassigned Dec. 30, 1994.

Decided March 29, 1995.

Douglas E. Hoffman of Gibbs, Feyder, Myers, Peters & Hoffman, Sioux Falls, for plaintiff and appellant.

Ronald W. Banks and Jerry D. Johnson of Banks, Johnson, and Colbath, Rapid City, for defendant and appellee.

MILLER, Chief Justice (on reassignment).

In this wrongful termination action, Mary Hale Johnston (Johnston) appeals the decision of the trial court granting summary judgment to her former employer, DLO-RAH, Inc. (DLORAH). We affirm.

## FACTS

DLORAH, doing business as National College (College), hired Johnston as a part-time instructor at College's Sioux Falls branch campus in January 1989. Effective June 18, 1990, DLORAH promoted Johnston to a full-time position as the director of the Sioux Falls branch. Johnston received College's employee handbook at that time.

In July 1990, less than a month after Johnston's promotion to branch director, DLO-RAH sold or leased all of the assets of College to another company, Learning Technologies Corporation (LTC). Although LTC replaced some personnel when it gained control of College, Johnston remained in her position. In January 1991, LTC exercised an escape provision in its purchase/lease contract with DLORAH. From January to May 31, 1991, DLORAH managed College on behalf of LTC. On May 31, 1991, DLORAH resumed full control and ownership of College.

Four months later, on September 26, 1991, DLORAH's Vice–President of Branches unexpectedly fired Johnston. Johnston had never received any warnings or reprimands about unsatisfactory work performance. The vice president gave no specific reason for Johnston's termination, indicating only that a "business decision" to bring in a new director had been made.

Johnston brought a wrongful termination action against DLORAH. Johnston argued that, according to the terms of the employee handbook, she could not be terminated without just cause. DLORAH contended that Johnston was an at-will employee and thus it was not obligated to give her a reason for her termination. Alternatively, DLORAH claimed that Johnston became a probationary employee when title to College's property reverted back to DLORAH on May 31, 1991. Probationary employees, under the terms of the handbook, can be terminated with or without cause at any time during their six-month probationary period.

Both parties filed motions for summary judgment as to their claims. The trial court granted summary judgment to DLORAH. The court found the handbook did limit DLORAH's right to terminate Johnston at will, but determined Johnston's employment was probationary and therefore not subject to the "just cause" protections in the handbook. Johnston appeals.

## DECISION

This Court recently addressed the issue of termination of employees under an employee handbook. In *Nelson v. WEB Water Dev. Ass'n, Inc.*, 507 N.W.2d 691, 696 (S.D.1993), we stated:

> South Dakota law provides that employment having no specified term may be terminated at the will of either party. SDCL 60-4-4. We have carved out two exceptions to this employment-at-will doctrine in cases where implied contracts arise through the use of employee handbooks. *Osterkamp v. Alkota Mfg., Inc.*, 332 N.W.2d 275 (S.D.1983). The two exceptions have been clearly defined by this court:
>
> > First, such an agreement may be found where the handbook explicitly provides, in the same or comparable language, that discharge can occur 'for cause only.' Second, a 'for cause only' agreement may be implied where the handbook contains a detailed list of exclusive grounds of employee discipline or discharge and,

a mandatory and specified procedure which the employer agrees to follow prior to any employee's termination.
*Butterfield v. Citibank of South Dakota,* 437 N.W.2d 857, 859 (S.D.1989). In short, the handbook must contain language indicating a clear intention on the employer's part to surrender its statutory power to terminate its employees at will[.]' *Id.*

■ In order to determine whether DLO-RAH *relinquished its authority to terminate* Johnston at will, we must review the 1991 handbook, which was in effect at the time of her termination. In a chapter entitled "Termination–Separation," this handbook states that "[a]n employee may be discharged without advance notice if the employee has been employed by the college on a full-time basis for less than six months" or "if the cause of such discharge is dishonesty, physical assault or threat of physical assault, for being under the influence of alcohol or drugs while on duty, or for gross acts unbecoming of one in his/her employment position." This chapter continues to advise that, absent these two situations, *i.e.*, full-time employment of less than six months or one of the enumerated causes, "an employee shall not be discharged or suspended without just cause. With respect to discharge or suspension, the employee shall be given at least one written warning notice of the complaint against such employee."

Although DLORAH fired Johnston only four months after its reacquisition of College, Johnston argues she was not a probationary employee. She contends that all or part of the eleven-month period she worked under LTC's ownership should be applied to satisfy the six-month probationary requirement. However, it is unnecessary to determine Johnston's status as a probationary employee to resolve this case. Even if Johnston had satisfied the probationary period, DLORAH did not violate its employee handbook by terminating her without providing just cause; a clear and conspicuous exception in the employee handbook effectively excludes Johnston's professional, salaried position from the "for cause only" provision.[1]

1. The dissent concludes that Johnston was not a

probationary employee at the time of her termi-

We begin by noting that Johnston's job of branch director was classified as a professional position in the June 1991 employee handbook. Documents in Johnston's personnel file further indicate this was a salaried, *i.e.* exempt, position. Significantly, Chapter 12 of the June 1991 handbook, entitled "Noncontractual Basis For Exempt Personnel," begins: "It is the policy of the college that administrative and professional exempt (salaried) staff positions are appointed on a noncontractual basis and usually for an indefinite period of time." Because Johnston's position was, in the plain language of the handbook, noncontractual and indefinite, she cannot now claim that she was wrongfully terminated due to noncompliance with an express or implied employment contract.[2]

■ We are unconvinced by any claim that this chapter and its first sentence were not sufficiently conspicuous. First, the chapter on the noncontractual basis of professional personnel immediately precedes the chapter on "just cause" terminations, thereby refuting the contention that the disclaimer was buried elsewhere in the handbook. Second, the chapter and its title appear in the handbook's table of contents. By simply scanning this table, Johnston would have been warned of the noncontractual status of exempt personnel. Third, page ii of the handbook gives a brief summary of each chapter, and states: "CHAPTER TWELVE addresses noncontractual basis for exempt personnel." Fourth, this chapter not only indicates that professional exempt positions are noncontractual, it also states that the compensation and duties of exempt management personnel are subject to change at any time by giving two weeks' written notice to the employee. By stressing the employer's option to alter job duties and compensation, the handbook

---

nation by DLORAH. According to the dissent, Johnston's employment with DLORAH was uninterrupted and satisfied the probationary requirement, because "[t]here is no evidence that Johnston consented to terminate her employment with DLORAH and become a new employee of LTC's."

We strongly disagree. According to *Yoselowitz v. People's Bakery, Inc.*, a case cited with approval by the dissent:

> If the employee has notice or knowledge of the substitution of a new employer and thereafter continues in his employment, he will be deemed to have accepted the new employer and to have terminated the relation previously existing with the old one.

277 N.W. 221, 223 (Minn.1938) (citing *Benson v. Lehigh Valley Coal Co.*, 144 N.W. 774 (Minn. 1914); *Murray v. Union Railway Co. of New York City*, 229 N.Y. 110, 127 N.E. 907 (N.Y.1920)). LTC took possession of National College effective July 1, 1990, and Johnston states she was informed of the sale some time in July 1990. Therefore, the suggestion that Johnston worked for LTC unknowingly is not supported by the evidence. Furthermore, there is simply no evidence in the record that upon learning of the sale, she resisted employment with LTC, or that the employment was otherwise "foisted" upon her as the dissent suggests. There are no affirmative statements indicating she objected to working for her new employer, and her continued, knowing service to LTC suggests she willingly remained in her job under a new employer. Because Johnston knew of the purchase by LTC and continued in her employment, she accepted LTC as her new employer and terminated her employment with DLORAH.

2. Inexplicably, the dissent claims that Chapter 12 only governs the elimination of exempt positions and does not apply to Johnston's termination. This conclusion, which forms the foundation of the dissent, is flawed. The plain language of Chapter 12 indicates that exempt employees are subject to termination without cause. The first sentence of Chapter 12 states, "It is the policy of the college that administrative and professional exempt (salaried) staff positions are *appointed* on a noncontractual basis and usually for an indefinite period of time." (Emphasis added.) The use of the word "appointed" refers to hiring an individual rather than creating a position. *See* Webster's Third New International Dictionary, Unabridged 105 (1971) (defining "appoint" as to *"place in an office or post "*) (emphasis added). Therefore, employees who are hired in exempt positions work on a noncon-tractual and indefinite basis and are excepted from the just cause protections reserved for other employees. In addition, the title of Chapter 12 is "Noncontractual Basis for Exempt *Personnel*." (Emphasis added.) If, as the dissent claims, the chapter addresses only the elimination of positions rather than the termination of employees, the title should refer to the noncontractual status of exempt *positions* rather than *personnel*. Finally, Chapter 12 emphasizes the precarious nature of every aspect of exempt employment. Besides designating any appointment as "noncontractual" and "indefinite," the chapter also states the College can modify the salary and duties of an exempt position by simply giving two weeks' notice.

Having fully reviewed the plain language of Chapter 12, we find ample evidence that exempt personnel are explicitly excluded from the "just cause" protections extended to other employees.

does not indicate an intent by the employer to bind itself to a definite contract with exempt personnel. Certainly, Johnston should reasonably be expected to have taken notice of an entire chapter dealing with the noncontractual and indefinite nature of exempt positions like her own. We will not penalize her employer for her failure to take notice of a clear and conspicuous exception in the employee handbook.

Affirmed.

AMUNDSON and KONENKAMP, JJ., concur.

SABERS, J., and WUEST, Retired Justice, dissent.

WUEST, Retired Justice (dissenting).

## SINCE DLORAH CONTROLLED AND DIRECTED JOHNSTON'S EMPLOYMENT AT ALL RELEVANT TIMES, THE TRIAL COURT'S CONCLUSION THAT JOHNSTON'S PROBATIONARY STATUS WAS REINSTATED, PERMITTING HER TO BE TERMINATED WITHOUT JUST CAUSE AND CONTRARY TO THE EMPLOYEE HANDBOOK, WAS IMPROPER.

Johnston's employment with DLORAH was terminated on September 26, 1991. However, Johnston's position was not eliminated as she was informed her replacement would take over the following morning. Chapter 12 of the employee handbook, on which the majority relies to support its holding, provides for the *elimination* of exempt positions as deemed necessary by National College's president or board of directors. Since Johnston's position was not eliminated, chapter 12 does not govern her termination without just cause. The "just cause" language in chapter 13 governing terminations is non-restrictive and refers generally to "employees," thereby including Johnston in its protections. Any ambiguity between these chapters should be construed against the drafter of the handbook, DLORAH. "[O]ne who speaks or writes a contract can by exactness of expression more easily prevent mistakes in meaning than one with whom he is dealing, therefore any doubts arising from ambiguity of language are resolved in favor of the latter." *Enchanted World Doll Museum v. Buskohl,* 398 N.W.2d 149, 152 (S.D.1986); Williston on Contracts § 621 (3d ed. 1961); *see Hicks v. Brookings Mall, Inc.,* 353 N.W.2d 54, 56 (S.D.1984).

In reviewing a grant of summary judgment, we view the evidence most favorably to the nonmoving party and resolve reasonable doubts against the moving party. *Lamp v. First Nat'l Bank of Garretson,* 496 N.W.2d 581, 583 (S.D.1993). "The burden of proof is upon the movant to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law." *State, Dep't of Revenue v. Thiewes,* 448 N.W.2d 1, 2 (S.D.1989). We should reverse the trial court's grant of summary judgment because DLORAH failed to show there are no genuine issues of material fact.

A more complete review of the facts is necessary to understand what occurred in this case. Just prior to Johnston's hire date, DLORAH entered into a purchase/lease agreement with LTC. This agreement allowed LTC to purchase the name of the college, some unemployment reserve account balances, and classroom, maintenance, and dormitory equipment for $1 million. DLORAH and LTC would jointly control National College operations for approximately one month, until July 6, 1990, at which time the bill of sale was delivered to LTC. Any conflict between the parties during this period of joint control would be resolved by DLORAH. Under the parties' agreement, LTC leased the real estate and certain equipment and inventory at the main campus in Rapid City from DLORAH and subleased real estate and equipment and inventory at the branch campuses from DLORAH.

The parties agreed that "ownership and operation of the going business known as National College" would be tied to the leased properties and LTC would not sell, assign, or mortgage the property. LTC further agreed that it would use the property and conduct college business utilizing the same methods DLORAH had used since 1988. Under the parties' agreement, DLORAH even dictated the college accreditation process to be used.

If LTC defaulted, liquidated damages of $11 million would be satisfied by DLORAH taking immediate possession of all properties leased or sold under the agreement. LTC was given an option to purchase all leased property for $11 million, and an escape provision allowed LTC to terminate the agreement for any reason. In the event of such termination, all property sold under the agreement would revert back to DLORAH at the end of the current academic quarter.

In October 1990, LTC replaced many administrators at the college but Johnston's position remained unaffected. Effective January 1, 1991, six months after receiving the bill of sale, LTC exercised the escape provision to terminate the purchase/lease agreement and entered into a second agreement with DLORAH. Under this new agreement, day-to-day management of National College was returned to DLORAH pending the end of the academic quarter, May 31, 1991, at which time title to the purchased property would revert back to DLORAH as well. LTC's remaining interest in the property during this period was liability for profit or loss of the going business.

DLORAH brought back many of its administrators who had been replaced by LTC's administrators in October. DLORAH's Director of Administration and Personnel for National College advised Johnston, upon Johnston's inquiry, that National College's March 1987 employee handbook governed employee matters while the management agreement was in effect.[1] As a result of this advice, Johnston relied on the 1987 handbook in managing employees under her direction and in her own employment relationship with DLORAH. Nine months after resuming full management of National College, DLORAH terminated Johnston giving rise to this lawsuit.

Johnston argued that, according to the terms of the employee handbook, she could not be terminated without just cause. DLORAH gave no reason for Johnston's termination and stated it was not obligated to do so, claiming Johnston was an at-will employee, or that she became a probationary employee when title to the school's property reverted back to DLORAH on May 31, 1991. Probationary employees, under the terms of the handbook, can be terminated with or without cause at any time during their six-month probationary period. The trial court found the handbook constituted a contract of employment between DLORAH and Johnston, that Johnston's position had not been eliminated, but that Johnston was a probationary employee at the time of termination.

The question is whether the sale/lease and subsequent reacquisition reinstated Johnston's probationary employee status. DLORAH's employee handbook states that non-faculty employees are probationary for the first six months of employment. DLORAH argues that Johnston became a probationary employee of DLORAH's once again when DLORAH reacquired title from LTC on May 31, 1991. According to DLORAH, it could then terminate Johnston's employment within six months without cause. However, there is no evidence to indicate that DLORAH's agreement with LTC had any effect on DLORAH's employment contract with Johnston, or, that the subsequent return of property to DLORAH would reinstate Johnston's probationary status.

"The relation of employer and employee arises out of contract, and the existence of an employment contract, express or implied, is essential to an employer-employee relationship." 30 C.J.S. *Employer–Employee* § 7 (1992); *Baker v. Jackson*, 372 N.W.2d 142, 147 (S.D.1985). This rule has also been addressed in relation to successor employers. *Yoselowitz v. People's Bakery, Inc.*, 201 Minn. 600, 277 N.W. 221 (Minn.1938). "The relation of employer and employee is contractual ... and that contract of employment cannot be changed so as to substitute a new employer without the employee's knowledge and consent." *Yoselowitz*, 277 N.W. at 223 (citations omitted). The gist of this rule was stated by Justice Cardozo in *Murray v. Union Railway Co. of N.Y. City*, 229 N.Y. 110, 127 N.E. 907 (N.Y.1920): "The new relation cannot be thrust upon the servant without

---

1. The termination provisions in the 1987 and 1990 handbooks are identical.

knowledge or consent." *Murray,* 127 N.E. at 907.

As regards the sale or transfer of a business to a successor employer, courts have held the master-servant relationship does not necessarily terminate by the sale and transfer by the master to a third person of the property and business in connection with which the relation arose and exits. *Benson v. Lehigh Valley Coal Co.,* 144 N.W. 774, 775 (Minn.1914). "[T]he authorities are clear that the original employer continues liable to the employees who have no notice of the change" and the burden is on the employer to show knowledge on the part of the employee. *Benson,* 144 N.W. at 775. Courts have also recognized that a new master cannot be foisted upon a servant unwittingly and the right to select one's employer is implicit in the freedom from involuntary servitude. *Darvell v. Paul A. Laurence Co.,* 239 Minn. 55, 57 N.W.2d 831, 834 (1953). "An employer may loan his employee to another so that for the time being the employee becomes the servant of the latter, but this can be done only with the employee's assent." *Darvell,* 57 N.W.2d at 834 (quoting *Crawford v. Duluth, Missabe & Iron Range R. Co.,* 220 Minn. 225, 19 N.W.2d 384, 387 (Minn.1945).[2]

In the instant case, ownership of all real property remained with DLORAH throughout its relationship with LTC, National College continued as an ongoing business under the same name, Johnston's office remained at the same location and she remained under the same employee benefit system. At all times, National College's employee hand-

book, which underwent no revisions during LTC's brief tenure, governed DLORAH's and Johnston's employment relationship. Language in the handbook limited DLORAH's ability to terminate Johnston except for just cause. There is no evidence that Johnston consented to terminate her employment with DLORAH and become a new employee of LTC's. Without this consent, Johnston could not be terminated by the purchase/lease agreement DLORAH made with LTC, a stranger to the contractual employment relationship existing between DLORAH and Johnston.

Furthermore, the record indicates DLORAH treated its employment relationship with Johnston as if it were continuing without effect from the terms of its agreement with LTC. Specifically, Johnston's status regarding her accrued employment benefits underwent no change when DLORAH reacquired management and, subsequently, title to National College from LTC. Johnston's employment as director of the Sioux Falls branch of the college continued uninterrupted from her hire date of June 18, 1990 until she was terminated by DLORAH September 26, 1991, a period of just over fifteen months. DLORAH's intent of uninterrupted employment is shown by a memo to Johnston dated April 1, 1991, i.e., during the interim period in which DLORAH was managing the college but prior to the date title reverted back. The memo indicates Johnston has twenty-four hours of accrued leave "for the 13 months (November 1, 1990 through Novem-

---

**2.** In *Yoselowitz,* the court found such assent to new employment where the first employer's bakery went out of business, another bakery was started at a new location bearing a new sign, and the employee went to the new business location to apply for and secure employment. *Yoselowitz,* 277 N.W. at 223. The two businesses had been separate corporations but had combined to form a new corporation prior to the employee's cause of action against his employer. The question before the court was by whom was the employee employed. The court found that the employee had consented to employment with the new corporation and could only recover, if at all, from the new corporation. *Id.*

In contrast, the Supreme Court of Iowa found no consent by the employee to employment by a new employer in *Janda v. Iowa Indus. Hydraulics, Inc.,* 326 N.W.2d 339, 343 (Iowa 1982).

The *Janda* facts are similar to the present situation. In *Janda,* the two employers were a parent and a subsidiary corporation. The subsidiary was incorporated shortly after Janda had been hired. The court distinguished *Yoselowitz* on its facts and held the evidence *did not support* a finding that the parties considered Janda's employment with the parent corporation terminated by a new contract with the subsidiary. *Janda,* 326 N.W.2d at 343. Specifically, the court noted that although the subsidiary corporation signed the employee's paycheck, the employee remained insured under the parent corporation's group health plan, received stock certificates from the parent corporation, maintained his office at the parent plant, and that all real estate and auto leases remained owed by the parent corporation. *Janda,* 326 N.W.2d at 343.

ber 30, 1991)."[3] The practice of carrying over Johnston's accrued leave time is inconsistent with DLORAH's claim that Johnston was a "new employee" on probation.

Basic principles of equity also support reversal of summary judgment for DLORAH. DLORAH informed Johnston in January 1991 that the National College handbook governed the interim period of management, informed Johnston of her accrued annual leave, and distributed to Johnston in June 1991 (after DLORAH had reacquired title) an updated (but unchanged in relevant part) employee handbook, *all without mentioning to Johnston a reinstatement of her probationary period,* and DLORAH should be estopped from terminating Johnston based on a probationary period. "[T]he authorities make it abundantly clear that an estoppel may arise under certain circumstances from silence or inaction as well as from words or actions.... The principle underlying such estoppels is embodied in the maxim 'one who is silent when he ought to speak will not be heard to speak when he ought to be silent.'" *In Estate of Williams,* 348 N.W.2d 471, 476–77 (S.D.1984) (quoting 28 Am.Jur.2d *Estoppel and Waiver* § 53 (1966).

Johnston was told by DLORAH's Personnel Director in January 1991 that DLORAH's employee handbook governed her employment relations with the school.[4] In *Hayes v. Battle Creek Power Co.,* 249 N.W. 629, 630, 61 S.D. 385, 387 (1933), an action for wages where the defendant denied being the employer, we stated the test to be applied was under whose control and direction the employee was working. Our decision in *Hayes* was subsequently cited by the Eighth Circuit Court of Appeals:

> When the relation of master and servant has existed up to a certain time, but it is claimed that such relation has ceased and been transferred to a third person, one of the tests is 'whether or not the servant by mutual agreement terminated his employment, ceased to be under the control and orders of the former master, renounced obedience to such master, and knowingly and willingly subjected himself to the orders of another under a new agreement with a new master.' The servant has a right to know for whom he works and of an attempt to enforce a change of masters. The power of control and direction is usually the deciding factor in ascertaining for whom the servant was working. The substitution of a new master must be by agreement with the servant.

(citations omitted). *Marion Steam Shovel Co. v. Bertino,* 82 F.2d 541, 547–48 (8th Cir.1936). Though *Marion Steam Shovel Co.* dealt with the "loaned servant doctrine," the reasoning is applicable here. At no time did Johnston terminate her employment with DLORAH and agree to work for LTC. At all relevant times, Johnston worked under DLORAH's direct control and direction. Even if one could accept DLORAH's argument and find that a new probationary period had begun, it would have started in January 1991 when DLORAH took over the daily management of the school pending receipt of title at the end of the academic quarter. This is a full nine months before DLORAH terminated Johnston's employment without cause and without warning.

I refuse to condone what appears to be a "shell game" using National College employees and, therefore, I dissent.

Sabers, J., joins this dissent.

---

**3.** LTC and DLORAH each held title to National College property at times included in this thirteen-month period.

**4.** This is the same handbook which gave Johnston her contractual right not to be terminated without just cause. There was no information in the handbook alerting National College employees that a new probationary period could start at any time other than an initial hire date. Likewise, there was no indication in the handbook that the sale/lease and reacquisition of National College would affect Johnston's contractual relationship with DLORAH.