**William MEYERS, Plaintiff,**

v.

**AMERICAN STATES INSURANCE COMPANY, Defendant.**

**Civ. No. 95–4113.**

United States District Court,
D. South Dakota,
Southern Division.

May 30, 1996.

Charles Rick Johnson, Johnson, Eklund, Nicholson, Dougherty & Abourezk, Gregory, SD, for Plaintiff.

Stuart L. Tiede, Woods, Fuller, Shultz & Smith, Sioux Falls, SD, for Defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

Plaintiff William Meyers ["Meyers"] filed his original Complaint against Defendant American States Insurance in South Dakota State court, alleging claims for indemnification pursuant to S.D.C.L. § 60-2-1, wrongful termination, and intentional infliction of emotional distress. Doc. 1. Defendant timely removed the action to federal court, and filed a motion for summary judgment. Doc. 10. Plaintiff filed a resistance to the motion for summary judgment, along with a motion to amend his complaint to add a breach of implied contract claim based on the language of the personnel manual. Doc. 16 & 17. On Friday, May 24, 1996, the Court heard oral arguments telephonically on the issue of whether American States' failure to follow its own destaffing procedures constitutes a breach of contract claim. The Court now

grants Plaintiff's motion to amend his complaint, and finds the "Personnel Policies and Procedures Manual" created an employment contract. The Court holds that the employment contract expressly reserved to American States the right of at-will termination, and grants summary judgment for Defendant on the wrongful termination claim. The Court further holds that some of the procedures in the personnel manual are mandatory and some are advisory, and finds that Plaintiff states a claim only for breach of the mandatory destaffing procedures. In addition, the Court grants summary judgment for Defendant on the claims for intentional infliction of emotional distress and indemnification in the original complaint.

## UNDISPUTED FACTS

William Meyers began working at American States Insurance in January of 1987. Doc. 11, Meyers Depo. at 7 [hereinafter "Meyers"]. He worked as a commercial underwriter until November or December of 1990 when he was promoted to a field sales manager's position. *Id.* at 17, 23. In approximately March of 1991, Meyers began to see a pattern of problems developing with one of the underwriters, Theresa Hamre ["Hamre"], working in his territory and he reported these problems to his immediate supervisor, Doug Sadler. *Id.* at 27, 39. Between March, 1991, and May, 1992, Meyers documented[1] and reported incidents involving Hamre with 10 out of 16 agencies in Sioux Falls. *Id.* at 40–41. The complaints from agencies included that Hamre failed to get quotes out, allowed her trips out of town and golf to interfere with her work, and declined to underwrite an account. *Id.* at 44–47, 53. Meyers expressed his concerns about Hamre's performance in writing to a number of management people, including Chuck White, Manager of Commercial Un-

derwriting, Doc. 19; Dick Frickey, Meyers' immediate supervisor, Doc. 13; and Tim Wallace, Division Vice President for Sioux Falls, Doc. 14. *Id.* at 61, 67–69.

In approximately March of 1991, Meyers became aware of the fact that Hamre and Tim Wallace were dating. *Id.* at 78–80. Hamre and Wallace were married July 21, 1994, after the events alleged in the complaint. Doc. 11, Wallace Depo. at 8. American States has no policy prohibiting coworkers from dating.[2] Meyers Depo. at 91, Wallace Depo. at 9. Wallace testified that he even spoke with the Vice President in charge of Personnel about dating Hamre and was told it was permitted. Wallace Depo. at 15. American States does have a written policy that a corporate officer cannot hire a relative, "Personnel Policies and Procedures Manual" at 205, and Wallace testified that the unwritten policy was that the employee would leave the corporation if he or she married a corporate officer. Wallace Depo. at 24–25.

On August 20, 1991, the Sioux Falls division implemented a program called New Directions. Wallace Depo. at 17. The goal of the program was to maximize profits by, in part, reducing the number of lines of insurance offered. *Id.* The evidence is that the program created problems throughout the company due to significant reductions in personnel and transfer of underwriting authority away from the division. *Id.* 19–20; Doc. 13, Frickey Depo. at 2. Wallace testified that Meyers' complaints about Hamre were typical of the complaints about all their underwriters received at that time because of the New Directions policy: "Bill's complaints about Theresa would be the same as we were hearing from other people and other field people about other underwriters." Wallace Depo. at 30–31.

---

1. Meyers kept a handwritten journal or notes of the problems, or "scenarios," he encountered. Doc. 11, Meyers Depo. at 31–34. Meyers is well-known for his meticulous documentation. *Id.* at 130; Doc. 11, Wallace Depo. at 21. Meyers did not bring these "notes" to his deposition, but he references them throughout, and appears to have documented every potential problem. It is not possible to say whether he documented potential

problems with any employee or just Hamre without seeing the notes.

2. Tim Wallace testified that he spoke with the Vice President of Personnel regarding American States policy towards employee dating, and was told that it was "acceptable" as long he was "careful regarding sexual harassment." Wallace Depo. at 15–16.

Hamre was transferred to the technology division in April or May of 1992. Wallace Depo. at 25. Hamre's transfer was related to the destaffing caused by the New Directions program. *Id.* Wallace would have ultimately approved the transfer. *Id.* at 26.

In June of 1992, Wallace received word that he had to "destaff" a field sales manager under the New Directions plan. Wallace Depo. at 37. Without specifying any criteria, Wallace told Frickey to select someone to destaff. *Id.* at 38, 41. Frickey selected Meyers because his field managers were all equally able, so he made his selection purely on the basis of seniority in the field sales position. Doc. 13, Ex. 1 at 2. Meyers was terminated immediately, and was escorted to his office to gather his belongings. Meyers Depo. at 60. After being destaffed, Meyers was offered a position with Auto Owners, his current employer, in Omaha, Nebraska, but he was "unable to make that move." *Id.* 101. He was unemployed for six months, and received unemployment insurance during that period.[3] *Id.* Meyers never requested that American States rehire him even though the company has a preferential hiring program for ex-employees. Wallace Depo. at 45–46; Manual at 208, 218. It was apparently well-known at American States that Meyers did not want to be transferred out of Sioux Falls. Wallace Depo. at 46; Meyers Employment Application, Doc. 11, Meyers Depo. Ex. 1.

Meyers initiated the instant suit on May 26, 1995. Doc. 12 at ¶ 25. Meyers alleges

that Wallace was displeased with Meyers' criticism of Hamre, and pressured Meyers' immediate supervisors to get Meyers to stop filing reports about her. Doc. 1, Complaint at VIII. Meyers, however, felt that part of his responsibility as field manager was to deal with complaints about underwriters made by agents, and that his loyalty to the company outweighed his personal discomfort. *Id.* at X. Meyers alleges that Hamre's and Wallace's relationship created a "conflict of interest" for the two, and that he was fired as a direct result. *Id.* at XIII. Although Wallace and Frickey testified that Meyers' termination was a result of the New Directions program and based only upon the time in the position of field sales manager, Meyers contends the reason is pretextual.[4] Doc. 18 at 4.

There are two "handbooks" at issue in this case. The first is entitled "Personnel Policies and Procedures Manual" [hereinafter "Manual"] and is dated June 1, 1992. Doc. 14 at Ex. 2. The second is entitled "Answers to Your Questions about American States" [hereinafter "Handbook"], is undated, and American States objects to its admissibility on the basis of foundation.[5] Doc. 18 at Ex. 1. The Employment Application is also relevant. The pertinent portions of these documents are reproduced in the margin.

## MOTION TO AMEND

A motion to amend is a procedural matter governed by federal law. *Hiatt v.*

---

3. After leaving American States, Plaintiff was unemployed for about six (6) months before he took a job with American West Insurance of Grand Forks, ND, with whom he stayed for about 14 months. Meyers Depo. at 6–7. He then worked for Honeywell for about a year before resigning to work for his employer as of August 1995, Auto Owners Insurance. *Id.* He and his family lived in Sioux Falls the entire time. *Id.* at 7–8.

4. The damages Meyers requests are the difference between what he currently earns and what he calculates he would have received had he remained at American States, including his projections on commission and an anticipated 8% increase in salary. Complaint at XIX; Meyers Depo. at 110–11, 112, 115. Meyers also requests punitive damages. Complaint at XX.

5. American States objects to consideration of Exhibit 1 to Plaintiff's Response to Defendant's Motion for Summary Judgment, Doc. 18, be-

cause "there is no foundation by way of affidavit, deposition testimony or otherwise." Doc. 21 at 8. Defendant is correct and Exhibit 1 will not be considered. The Exhibit is attached to Plaintiff's brief, it is not mentioned in any of the depositions provided to the Court, and it is also undated. Even if proper foundation had been established, the Exhibit is not helpful to Plaintiff as it specifically states an employee may be terminated without warning and lists eleven instances which "could result in immediate dismissal." Doc. 21, Ex. 1 at 15. The list is a partial listing of the possible reasons listed for immediate dismissal in the Manual. Doc. 14, Ex. 2 at 702–03. As Plaintiff only provided the Court with selected pages of the Handbook, the Court cannot tell whether the list is continued on page 16. *See* Doc. 21, Ex. 1 at 15.

*Mazda Motor Corp.*, 75 F.3d 1252, 1258 (8th Cir.1996) ("[A] federal district court in a diversity case is neither required, nor indeed permitted, to apply state law to a matter covered by a Federal Rule of Civil Procedure."). Fed.R.Civ.P. 15 requires that "leave to amend a complaint 'shall be freely given when justice so requires,' but the granting of such a motion is left to the discretion of the district court." *Kaufmann v. Sheehan*, 707 F.2d 355, 357 (8th Cir.1983) (quoting Fed. R.Civ.P. 15(a)). Leave to amend will be granted unless there is good cause for denial. *Fuller v. Secretary of Defense*, 30 F.3d 86, 88 (8th Cir.1994). "As explained by the Supreme Court, absent a good reason for denial—undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of

amendment—leave to amend should be granted." *Thompson–El v. Jones*, 876 F.2d 66, 67 (8th Cir.1989). In addition, "[a]mendment of the complaint is futile if the amendment will not cure a deficiency in the original complaint or if the amended complaint cannot withstand a motion to dismiss." *Harter v. GAF Corp.*, 150 F.R.D. 502, 510 (D.N.J. 1993).

Plaintiff moves to amend his pleadings to add a fourth cause of action for breach of contract alleging "rights to continued employment and no [sic] to be either summarily terminated or eliminated as a part of an alleged destaffing" "controlled" by American States employee handbook. Doc. 16, Amended Complaint at XXI. Defendant argues that it has been prejudiced by Meyers' untimely motion to amend because Meyers' focus on the employment manual[6] is a new

6. The Manual begins with an introductory letter from the Vice President of Personnel, in which it states in part:

The purpose of this manual is to describe the company's current personnel policies and procedures. The company reserves the right to change those policies and procedures at any time, and without notice. Nothing contained in this manual is intended, nor should it be construed, to confer any rights on employees or to impose any contractual or other obligation on the company.

Doc. 14, Ex. 2 at 1; Doc. 18, Ex. 1 at 2. The Manual next contains a history of the company. In the first substantive portion of the Manual, "employees" is defined in the following manner:

All employees of the American States Insurance companies are "employees at will." This means that either the employee or the company may terminate the employment relationship at any time. Though the company maintains certain policies and procedures to guide it in its dealings with employees, these are not intended, nor should they be interpreted as creating any employment rights or contractual relationship....

Doc. 14, Ex. 2 at 201. The Manual then goes on to discuss company practices, benefits, and rules.

The employment application completed by Meyers also states, set off in capital letters just above the signature line:

IN CONSIDERATION OF MY EMPLOYMENT, I AGREE THAT MY EMPLOYMENT AND COMPENSATION CAN BE TERMINATED WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE, AT ANY TIME, AT THE OPTION OF EITHER AMERICAN STATES OR MYSELF.

Doc. 14, Ex. 1 at 5.

With regard to termination, the American States Manual states:

XIV. Termination

Termination is a voluntary or involuntary separation from employment ...

A. Resignation

1. Employees who resign while in good standing are requested to give two weeks notice....

B. Dismissal

1. Immediate dismissal of an employee may be made only when serious violation of company rules exists (See Discipline and Rules Section) [VII]

....

2. In the case of dismissal for reasons other than state above, certain steps should be taken before an employee is discharged....

Doc. 14, Ex. 2 at 219–20. The Discipline and Rules Section sets out four steps for disciplinary actions: verbal warning, written warning, notice of probation and, finally, termination. *Id.* at 702.

The "Reduction in Staff" section outlines a different procedure:

In the event a reduction in staff should be necessary, due to organizational or operational changes, the following standardized procedure will be followed.

A. The affected department will advise the Personnel Department, or division vice president, of the design and development of any procedures that will result in job elimination....

B. When the size and schedule of reduction is determined, the department manager will inform the department employees of the circumstances, select employees to be destaffed, and forward to Personnel the employee profiles for these individuals. A minimum of two weeks' notice should be given to the employee and Personnel.

C. A personnel representative will meet with each employee to evaluate and discuss skills,

theory. Doc. 23 at 3. Plaintiff responds that no prejudice exists because only eleven months have passed since the original complaint was filed, the new claim arises from the same transaction as the previous claims, and American States raises the Manual as its defense so there is no surprise from the additional claim. Doc. 22 at 4.

■ Although not timely filed,[7] the Court finds no surprise or prejudice to Defendant from a claim based on the Manual since Defendant raised the Manual in its own defense. For the reasons stated in this opinion, amendment of the Complaint would not be futile. Accordingly, the Court grants the Motion to Amend.

### WRONGFUL TERMINATION

■ The at-will doctrine still exists in South Dakota.[8] The doctrine is codified and reads:

An employment having no specified term may be terminated at the will of either party on notice to the other, unless otherwise provided by statute.

S.D.C.L. § 60–4–4 (1993). Wrongful termination suits are subject to the at-will doctrine. *Bass v. Happy Rest, Inc.*, 507 N.W.2d 317, 320 n. 5 (S.D.1993). South Dakota has identified three exceptions to the at-will doctrine:

Employees may be terminated at-will in South Dakota, except for (1) terminations that contravene public policy, (2) employees with express "for cause only" agreements or implied "for cause only" cases where an employee handbook contains a

detailed list of exclusive grounds for discharge and a mandatory specific procedure that the employer agrees to follow, or (3) an employee who accepted employment after being promised future promotion to a certain position.

*Id.* at 321 (footnotes omitted). Whether an employee is an at-will employee is a question of law. *Richardson*, 531 N.W.2d 23 at 27.

■ Meyers argues that his termination claim falls within either the public policy exception or, by way of his motion to amend his complaint, the handbook exception to the at-will doctrine. "[T]he employee has the burden of proving that the dismissal violates a clear mandate of public policy." *Johnson v. Kreiser's, Inc.* 433 N.W.2d 225, 227 (S.D.1988). "Whether the act complained of violates a clear mandate of a substantial public policy is a question of law." *Niesent v. Homestake Mining Co.*, 505 N.W.2d 781, 783 (S.D.1993).

■ With regard to the public policy exception, Plaintiff's Complaint states, "The Plaintiff's termination was unlawful and against public policy. . . ." Complaint at XV. The Court first notes that South Dakota has consistently refused to recognize a tort for wrongful termination. *Peterson v. Glory House of Sioux Falls*, 443 N.W.2d 653 (S.D. 1989) (citing *Johnson*, 433 N.W.2d at 227). Next, Meyers would have the Court find that, as an employee, he had a duty to report Hamre's allegedly deficient performance based on S.D.C.L. § 60–2–8:

An employee must perform his service in conformity to the usage of the place of

---

qualifications, and the availability of alternative job opportunities.
D. Posting available positions or seeking outside applicants will be deferred until all qualified destaffed employees have been considered.
Doc. 14, Ex. 2 at 218.

7. The Court notes that Plaintiff's motion is not timely. This action was removed to federal court on June 13, 1995. Doc. 1. The Court's Scheduling Order gave the parties until December 15, 1995, to amend pleadings, and required that dispositive motions be filed by March 15, 1996. Doc. 9. The Motion to Amend was filed on April 8, 1996, along with Plaintiff's response to Defendant's Motion for Summary Judgment—three days after the April 5, 1996, date set by the Court

for answers to dispositive motions. Doc. 9, 16, 18. Trial in this matter is scheduled for June 11, 1996. Doc. 9. The Court has been offered no explanation why this claim was not pleaded in a timely manner and the Defendant's request for additional time is granted.

8. The parties seem to agree—by implication—that South Dakota law applies. For example, Plaintiff pleads a violation of South Dakota statute and argues South Dakota wrongful termination cases. Defendant raises South Dakota statutes of limitations and argues South Dakota standards for amending pleadings. There being no dispute, the Court will apply South Dakota law.

performance unless otherwise directed by his employer, or unless it is impracticable, or manifestly injurious to his employer to do so.

*Id.* Meyers argues, without evidence, that his duty was to the profitability of the company, and that he would have been disciplined had he ignored Hamre's deficient performance. Doc. 18 at 25. This is a standard that Meyers seems to have set for himself based on his own definition of good faith[9] and conflict of interest, not a policy set by American States. *See* Meyers Depo. at 90–91; Handbook, Doc. 14, Ex. 2 at 110. The evidence is that American States did not prohibit employee dating, Wallace Depo. at 15, and nowhere can the Court find a requirement that employees were required to report problems with their co-workers. The Court finds that S.D.C.L. § 60–2–8 does not establish a duty of loyalty which would place this case within the public policy exception to the at-will doctrine.

 Meyers also suggests, based on his reading of *Peterson v. Glory House of Sioux Falls,* 443 N.W.2d at 653, that South Dakota would adopt a whistleblower exception to the at-will doctrine, and this case would fall within such an exception. First, *Peterson* held that under its facts, the case could not be placed within South Dakota's public policy exception to the at-will doctrine. *Id.* at 655. The *Peterson* court chose not to expand the doctrine. *Id.* Second, Meyers finds it significant that he reported his problems with Hamre to his superiors—*Peterson* did not fit into the "whistleblower" exception as it exists in some states because Peterson told a fellow employee of the problem rather than his superior. Doc. 18 at 24. Even though the court in *Peterson* acknowledged that, factually, the case fit some states' definition of "whistleblower," it found Peterson was not fired for refusing to commit an unlawful or criminal act, as required for the public policy exception in South Dakota. *Id.* The Court finds that Meyers' reports of problems concerning a fellow employee do not rise to the level of "whistleblowing," and certainly do not involve illegal or criminal acts, as required for South Dakota's application of the public policy exception.

With regard to the second exception to the employee-at-will doctrine, Meyers argues next that the employee handbook creates a "for cause only" employment contract. Amended Complaint at XXI–XXII. The exception was first articulated in *Osterkamp v. Alkota Mfg., Inc.,* in which the South Dakota Supreme Court held a handbook stating, "The Company will not discharge nor give disciplinary layoff to any employee without just cause," along with a detailed procedure for corrective discipline, created an employment contract. 332 N.W.2d 275, 277 (S.D. 1983). South Dakota further refined the *Osterkamp* exception in *Butterfield v. Citibank of S.D., N.A.,* by more clearly articulating "two possible ways an employee handbook could create a 'for cause only' agreement":

> First, such an agreement may be found where the handbook explicitly provides, in the same or comparable language, that discharge can occur "for cause only." Second, a "for cause only" agreement may be implied where the handbook contains a detailed list of exclusive grounds for employee discipline or discharge and, a mandatory and specific procedure which the employer agrees to follow prior to any employee's termination.

437 N.W.2d 857, 859 (S.D.1989) (citations omitted).

 As the South Dakota Supreme Court has written, with regard to employment contracts specifically:

> Where a provision of a contract is ambiguous, evidence must be introduced to determine what the intentions of the parties were and such evidence creates a question of fact which must be resolved by a jury. However, whether ambiguity exists in a contract is a question of law for the court.

*Gear & Joint Co.,* 433 N.W.2d 221, 224 (S.D. 1988). To the extent that Meyers pleads a public policy exception to the employment-at-will doctrine based on good faith, his complaint must fail. *See* Meyers at 90–91, 107.

---

9. The South Dakota Supreme Court has consistently refused to find an implied covenant of good faith and fair dealing in employment-at-will relationships. *Bass v. Happy Rest, Inc.,* 507 N.W.2d 317, 321 (S.D.1993); *Breen v. Dakota*

*Butterfield,* 437 N.W.2d at 858. Under traditional contract principles:

> [A contract] must be construed as a whole, and the intentions of the parties is to be ascertained from the entire instrument. Every effort should be made to give effect to every part of the contract and the interpretation should not be such as to excise any provision.

*Crowley v. Texaco, Inc.,* 306 N.W.2d 871, 874 (S.D.1981).

■ Meyers argues that the Manual is internally inconsistent because it contains both mandatory and advisory language, and is therefore ambiguous. Doc. 18 at 13–15. The Court finds the provisions of the Manual are unambiguous. Furthermore, the Court finds it possible to give effect to both mandatory and advisory procedures as set out in the Manual. When the Manual is examined in its entirety, it is clear that this is an employment contract between the parties covering a variety of subjects. Certain of the provisions are advisory only, and not mandatory. The contract does not limit, at least in the situation presented, termination to "for cause" situations. The contract does, however, mandate procedures to be followed when a Reduction in Staff creates the possibility of termination, as in the case before the Court.

■ First, the Court finds American States' Manual does not create a "for cause only" contract. The Manual does not contain an explicit "for cause only" statement. *See Butterfield,* 437 N.W.2d at 857; *Stedillie v. American Colloid Co.,* 967 F.2d 274, 277 (8th Cir.1992). To the contrary, the Manual as well as the Employment Application contain several disclaimers. Plaintiff asks the Court to find these disclaimers are not sufficiently conspicuous to alert an employee that he may be terminated without cause, citing *Johnston v. DLORAH, Inc.,* 529 N.W.2d 201 (S.D. 1995). Doc. 18 at 17.

■ It is true that the disclaimer in the Introductory Letter to the Manual is not conspicuous. Doc. 14, Ex. 1 at 1. But it is not the only disclaimer. The disclaimer in the definition of employee is very clearly worded, and it is the first paragraph of the first substantive section of the Manual. *Id.* at 201. It is indexed as both "Employee, Definition of" and "Definition of Employee." *Id.* at Index. Although Meyers argues that the disclaimers should be stated in the sections of the Manual dealing with termination in order to be effective, the placement as a definition of employee is appropriate. Also, the disclaimer on the Employment Application is all capitalized and conspicuous. Doc. 14, Ex. 1 at 5. These disclaimers are sufficient to reserve to American States the right to discharge an employee at-will.

■ Second, Meyers argues that American States' Manual created an implied agreement to dismiss only for cause. Doc. 18 at 13. Meyers argues specifically that the Manual's listing of reasons for immediate discharge is exclusive—an employee may only be discharged for the listed offenses and no others. *Id.* at 14. Meyers misreads the listing of reasons for immediate discharge. These termination procedures are clearly advisory: it is "requested" that an employee give two weeks notice when resigning, and the list of reasons for immediate termination "include the following." Doc. 14, Ex. 1 at 219, 702. The Manual does not meet the requirements of an implied "for cause only" contract because it does not meet the first requirement—"a detailed list of exclusive grounds for employee discipline or discharge"—of *Butterfield,* 437 N.W.2d at 859.

■ Meyers also cites the Court to the sections referencing Reductions in Staff. Doc. 18 at 14; *see* Doc. 14, Ex. 1 at 618. The "Reduction in Staff" section contains a detailed four step procedure for "destaffing." The Court finds that these procedures do meet the two prong test from *Butterfield:* when an employee is terminated exclusively as a result of a destaffing, the Manual sets out a "mandatory and specific procedures which the employer agrees to follow...." *Id.* As the South Dakota Supreme Court intimated in *Butterfield,* the issue of "for cause only" termination is only one of a number of subjects which an employment contract may encompass. *Id.* at 860 ("Thus, a 'for cause only' termination agreement will constitute a binding and enforceable contract (*Osterkamp, supra* ) but an employment con-

tract need not always contain a 'for cause only' termination agreement."). I find that American States reserved its right to terminate employees at-will, but also contracted to follow its "Reduction in Staff" procedures as set forth in the "Personnel Policies and Procedures Manual." Although Plaintiff has no claim for wrongful termination under South Dakota's at-will doctrine, he has stated a claim in Count IV of the Amended Complaint for breach of contract for failure to follow the "Reductions in Staff" procedures.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

 Meyers pleads a claim for intentional infliction of emotional distress resulting from intense pressure to "subjugate his obligations ... to the personal desires of Wallace and Hamre, as well as his subsequent discharge ..." Complaint at XVIII. The elements required to establish a *prima facie* case of intentional infliction of emotional distress are:

(1) an act by defendant amounting to extreme and outrageous conduct; (2) intent on the part of the defendant to cause plaintiff severe emotional distress; (3) the defendant's conduct was the cause in-fact of plaintiff's injuries; and (4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct.

*Tibke v. McDougall,* 479 N.W.2d 898, 906 (S.D.1992). In order to meet the first requirement, conduct must be "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 907.

 Meyers' allegations do not rise to the level of outrageous conduct. In *Richardson,* the South Dakota Supreme Court summarized those cases where courts did and did not find outrageous behavior. 531 N.W.2d at 28. Meyers own summary of the "outrageous" conduct he experienced follows:

Q: In what way—when you say you were undergoing great mental distress, describe for us what it was you were undergoing?

A: At which period in time?

Q: Well, I assume it relates to the love affair, whenever it was that you concluded there was a love affair between Mr. Wallace and Ms. Hamre.

A: The meetings that I was drawn in to deal with this, being told by management to quit bringing this to me, you know nothing is going to be done with it, throwing it back in my face, going into another meeting, showing them exactly what the scenario was, having them deal with it, having them tell me that they are going to give Theresa 90 days to straighten out her territory or we are going to move her somewhere else, 90 days goes by, she is still doing exactly what she was doing before you make mention to the statement of 90 days if she doesn't have the territory cleaned up we are going to have to move her out of the territory or something. Everything I did focused back to Theresa Hamre.

The Sioux Falls territory for which I was the sales manager was a major portion of my territory, major portion. So there is a lot of emphasis going to be dealt in that territory. Having to deal with the concerns of agents for over a year and a half until you are terminated, then remaining unemployed for approximately six months, going with a company where you are traveling in two, one and a half states out away from your family where with the prior position you were never out overnight, then dealing with the fact that they actually don't want to develop that territory the way you had decided when you went to work for them, going with another employment scenario, and then eventually going into another position to try and get back to where you were when you were terminated by American States is great mental distress, plus the pressures that my family was put under.

Meyers Depo. at 97–98. Taking guidance from the summary in *Richardson,* it is clear that Meyers was not the victim of outrageous conduct, either as a result of the relationship between Hamre and Wallace or as a result of his termination. Defendant's motion for

summary judgment on this claim is granted.[10]

### S.D.C.L. § 60–2–1

Meyers pleads his discharge was a result of his obedience to his employer, and he is therefore entitled to indemnification pursuant to § 60–2–1, for the losses resulting from his termination. Complaint at XIV. Defendant moves for summary judgment arguing (1) that the plain language of the statute indicates that indemnification can only occur for losses incurred during employment, and (2) that should the Court find § 60–2–1 applies, termination is an "ordinary risk" of business, pursuant to S.D.C.L. § 60–2–2. Doc. 11 at 14. Plaintiff responds by asking the Court for a new interpretation of § 60–2–8 as stating a duty or standard on the part of an employee to report behavior by other employees that was deficient and threatened the profitability of the company. Doc. 18 at 24–25. Neither party cites case law in support of its interpretation of these statutes.

■ It appears to the Court that any duty that may have been violated was created in the mind of the Plaintiff and not by § 60–2–8. In addition, § 60–2–1, by its language, "in direct consequence of the discharge of his duties as [an employee]," applies to losses incurred during employment. Termination is an ordinary risk of employment—even when protected by an employment contract. Summary judgment is granted for Defendant on the indemnity claim.

IT IS ORDERED:

(1) That Plaintiff's Motion to Amend Complaint, Doc. 16, is granted only to the extent that it states a claim for breach of contract for failure to follow the "Reduction in Staff" procedures from the "Personnel Policies and Procedures Manual."

**10.** Plaintiff also requests punitive damages. Punitive damages are allowed for the intentional infliction of emotional distress claims. *Bass*, 507 N.W.2d at 324. However, as the underlying claim for intentional infliction of emotional distress has been dismissed, the punitive damages

(2) That Defendant's Motion for Summary Judgment, Doc. 10, is granted as to all claims in the original complaint.

claim must also be dismissed. Punitive damages are not allowed for this breach of contract claim under South Dakota Law as there is no independent tort. S.D.C.L. 21–3–2. See 35 S.D.L.Rev. 118 (1990).